**KENTUCKY UTILITIES CO. et al. v. PUBLIC SERVICE COMMISSION et al.**

Court of Appeals of Kentucky.

June 20, 1952.

As Modified on Denial of Rehearing
Nov. 13, 1952.

888

Squire R. Ogden, B. Hudson Milner, Louisville, F. C. Williams, C. S. Weakley, Cincinnati, Ohio, Stephens L. Blakely, Covington, for appellant.

A. E. Funk, Atty. Gen., J. Gardner Ashcraft, Asst. Atty. Gen., J. M. McIntire, Flemingsburg, Chas. L. Hobson, Frankfort, for appellee.

CULLEN, Commissioner.

East Kentucky Rural Electric Cooperative Corporation (East Ky.) made application to the Public Service Commission of Kentucky, under KRS 278.020, for a certificate of convenience and necessity authorizing construction of a steam generating plant, and transmission lines, for the purpose of supplying electric energy to the distribution systems of the local rural electric cooperative corporations (co-ops) throughout the state. The application was opposed by Kentucky Utilities Company (K. U.), Louisville Gas and Electric Company (L. G. & E.) and Union Light, Heat and Power Company (Union), which companies are now engaged in supplying electric energy to the co-ops and to other distribution systems and consumers in Kentucky.

The Public Service Commission granted a certificate authorizing East Ky. to construct a steam generating plant consisting of two 20,000 Kilowatt (KW) units, and to construct 597 miles of transmission lines, and further authorized East Ky. to borrow $12,265,000 from the Federal Rural Electric Administrator, to finance the construction. K. U., L. G. & E. and Union brought an action in the Franklin Circuit Court, under KRS 278.410, to set aside or vacate the order of the commission. The circuit court sustained the order, and the plaintiff utilities have appealed to this Court.

After the appeal was submitted, the appellants moved that the appeal be dismissed

on the ground that the case had become moot by reason of the failure of East Ky. to begin construction within one year from the date the certificate was granted, as required by KRS 278.020. The appellees moved to strike the appellants' motion. The appellees' motion is sustained, for reasons stated at the end of this opinion.

East Ky. is a cooperative membership corporation organized under the provisions of Chapter 279, KRS, for the purpose of producing and transmitting electric energy. Its membership consists of 18 distribution co-ops now operating local facilities for the distribution of electric energy, serving 90,000 consumers in 84 counties.

At the present time, the co-ops receive their electric energy from K. U., L. G. & E., Union, and Kentucky-West Virginia Power Company. K. U. supplies all of the energy received by thirteen of the co-ops, and part of that received by two. L. G. & E. supplies all of the energy received by one of the co-ops, Union supplies part of the energy received by one, and Kentucky-West Virginia supplies all of the energy received by two and part of the energy received by one.

The record indicates that the sales of energy to the co-ops represent the following percentages of the total energy sales of the four utilities: K. U., 6 to 7 percent; L. G. & E., 0.4 percent; Union, 2 percent; Kentucky-West Virginia Power Company, 1.6 percent. The record further shows that 25 percent of the total power supply of K. U. is purchased from out-of-state generating companies, and all of the power of Union is similar imported power.

Although the immediate application of East Ky. was only for a certificate authorizing construction of a generating plant with a capacity of 40,000 KW and the construction of 597 miles of transmission lines, to serve the load centers of thirteen of the co-ops, plans submitted in connection with the application, outlining the ultimate proposed operations of East Ky., call for the construction of two additional 40,000 KW generating units, and 858 additional miles of transmission lines, resulting eventually in a system with a total generating capacity of 120,000 KW and with a total of 1455 miles of transmission lines, to serve all of the co-ops. These plans contemplate an increase in the number of consumers of the co-ops from the present 90,000 to approximately 150,000. It is recognized that the ultimate plans of East Ky. cannot be carried out without additional loan commitments from the Federal Rural Electric Administrator, and without further certificates of convenience and necessity from the Kentucky Public Service Commission. It is stated in the briefs that since the commencement of this action in the circuit court, East Ky. has applied for a certificate authorizing construction of an additional portion of its proposed system, and for authority to borrow an additional $11,687,000 from R. E. A.

The determination of the Public Service Commission to issue a certificate to East Ky. necessarily was based upon a finding that public convenience and necessity required the construction of the proposed facilities of East Ky., because the statute requires such a finding as a prerequisite to the issuance of a certificate. KRS 278.020. We will address our attention to the question whether the Commission gave proper consideration to the essential elements that enter into the matter of convenience and necessity.

■ At the outset, we think it should be made clear that the question is not simply whether the public convenience and necessity require more *service,* but rather whether the public convenience and necessity require a new service *system* or a new service *facility.* See Whittaker v. Southeastern Greyhound Lines, 314 Ky. 131, 234 S.W.2d 174.

■ We think it also should be made clear that there is no rule in this jurisdiction giving to an existing utility the absolute right, or imposing upon it the absolute duty, to make its service adequate, before a new utility will be permitted to enter the field. Some of the decisions of this Court, particularly the decision in City of Olive Hill v. Public Service Commission, 305 Ky. 249, 203 S.W.2d 68, have been sought to be construed to lay down such a rule. However, an examination of the

opinion in the Olive Hill case will disclose that the reason for denial of a certificate to the new utility was to prevent unnecessary duplication of plants, facilities and service, and "ruinous" competition, and the basis of the decision was that the nature and extent of the inadequacy of service was not such as to establish the necessity for a new service system.

■ We think it is obvious that the establishment of convenience and necessity for a new service system or a new service facility requires first a showing of a substantial inadequacy of existing service, involving a consumer market sufficiently large to make it economically feasible for the new system or facility to be constructed and operated.

Second, the inadequacy must be due either to a substantial deficiency of service facilities, beyond what could be supplied by normal improvements in the ordinary course of business; or to indifference, poor management or disregard of the rights of consumers, persisting over such a period of time as to establish an inability or unwillingness to render adequate service.

■ The above two factors have relation to the *need* of particular consumers for service. However, our concept of the meaning of "public convenience and necessity," as expressed in our decisions in previous cases, embodies the element of absence of wasteful duplication, as well as a need for service. See City of Olive Hill v. Public Service Commission, 305 Ky. 249, 203 S.W.2d 68; Whittaker v. Southeastern Greyhound Lines, 314 Ky. 131, 234 S.W.2d 174; Cannonball Transit Co. v. Sparks Bros. Bus Co., 255 Ky. 121, 72 S.W.2d 1021; Cardinal Bus Lines v. Consolidated Coach Corp., 254 Ky. 586, 72 S.W.2d 7; and Utter v. Black, 305 Ky. 136, 202 S.W.2d 425. Therefore, a determination of public convenience and necessity requires both a finding of the need for a new service system or facility from the standpoint of service requirements, and an absence of wasteful duplication resulting from the construction of the new system or facility.

■ At first impression, it might appear that the two requirements are in reality only one, because there could not be a need for a new service system or facility if the construction of the system or facility would result in wasteful duplication. This impression would be correct if "duplication" is considered as having only the meaning of an excess of capacity over need. However, we think that "duplication" also embraces the meaning of an excessive investment in relation to productivity or efficiency, and an unnecessary multiplicity of physical properties, such as right of ways, poles and wires. An inadequacy of service might be such as to require construction of an additional service facility to supplement an inadequate existing facility, yet the public interest would be better served by substituting one large facility, adequate to serve all the consumers, in place of the inadequate existing facility, rather than constructing a new small facility to supplement the existing small facility. A supplementary small facility might be constructed that would not create duplication from the standpoint of an excess of capacity, but would result in duplication from the standpoint of an excessive investment in relation to efficiency and a multiplicity of physical properties.

The general findings of fact made by the Public Service Commission in the case before us seem to recognize that a determination of convenience and necessity requires a showing of absence of duplication as well as a need for service, but, as will presently be developed, we think that the Commission erroneously ascribed a limited meaning to the term "duplication." The findings were:

"1. That public convenience and necessity require the construction, operation and maintenance of the proposed generating and transmission facilities applied for in the application.

"2. That the proposed construction does not duplicate present generating and transmission facilities owned by the protesting utilities.

"3. That the proposed generating and transmission facilities, when constructed, can deliver energy to the member RECC's at a cost at least as low as their present purchase cost."

From the written opinion filed by the Public Service Commission, it is apparent that the finding of public convenience and necessity (No. 1 above) was addressed to the matters of inadequacy of present service and of present service facilities, and the economic feasibility of the proposed plans of East Ky. As hereinbefore explained, those matters have to do with the *need* for a new service system. We are of the opinion that the record supports the findings of the Commission on these matters, as will be discussed in more detail at a later point in this opinion.

Apparently having in mind the necessity to find an absence of harmful duplication, the Commission in its finding No. 2 found that the proposed facilities of East Ky. would not duplicate present facilities of the protesting utilities.

It will be obvious that if duplication means only an excess of capacity over need, the finding of the Public Service Commission that the proposed facilities of East Ky. will not duplicate existing facilities of the protesting utilities is meaningless, when added to a previous finding that there is a need for the proposed facilities. It is reasonably clear that the Commission was using the term "duplication" in the limited sense above indicated, because the written opinion of the Commission recites that the proposed transmission lines would not "replace" a single line now in operation, and that all existing transmission lines will still be necessary and useful. Clearly, if the proposed lines would supplant or render useless existing lines, there would have been no basis for the finding that the proposed lines were needed to render service (leaving aside the question of inadequacy of service arising from indifference or poor management).

In its finding No. 3, the Commission found that the cost to the co-ops, of service from East Ky., would be at least as low as their present purchase cost. This finding seems to touch upon the question of duplication from the standpoint of an excessive investment in relation to efficiency, but it will be observed that the finding relates only to the cost to the co-ops, and does not consider possible increased costs to the remaining consumers of the existing utilities, who might well be compelled to pay higher rates as a result of the loss of the co-op market by the existing utilities.

■ We are of the opinion that the Public Service Commission should have considered the question of duplication from the standpoints of excessive investment in relation to efficiency, and an unnecessary multiplicity of physical properties. However, as far as *generating* facilities are concerned, the record indicates that no duplication from those standpoints would result from the construction of the proposed generating plant of East Ky. The evidence establishes that it will not cost more for East Ky. to build a new generating plant than it would for the appealing utilities to expand their generating plants. Also, there would be no serious problem of multiplicity of physical properties because there has been no suggestion of building one large plant in lieu of a number of smaller plants.

We are convinced that there is a necessity for the generating facilities which East Ky. proposes to construct, and that the co-ops need the power that the proposed plant will provide. We are of the opinion that the Public Service Commission properly authorized the construction of the generating plant, and that the energy from that plant should be made available to the co-ops. However, the matter of distribution of the energy presents a serious problem as concerns duplication of transmission facilities. If harmful duplication will result, in some instances, from the construction by East Ky. of its own separate transmission system, then public convenience and necessity may better be served through distribution of the energy to some of the co-ops under "wheeling" contracts. See Public Utilities Fortnightly, Vol., No. 5, pp. 267 to 271.

■ The evidence taken before the Public Service Commission establishes that some of the proposed transmission lines of East Ky. will not *parallel* existing lines of the appealing utilities, or lines that the appealing utilities necessarily must build in order to serve their nonco-op. consum-

ers, and with respect to those lines there will be no duplication in any of the meanings we have ascribed to the term. However, other of the proposed lines of East Ky. will parallel existing or necessarily required lines of the appealing utilities, and as concerns these lines the record does not furnish any satisfactory basis for determining whether harmful duplication may result from the two standpoints which the Public Service Commission did not consider.

The appealing utilities have proposed a plan for a substantial expansion and enlargement of their transmission systems, over the period from 1950 to 1959, involving an expenditure of some $12 million. They maintain that this will be necessary regardless of whether they continue to serve the co-ops, and East Ky. seems to concede that fact.

There arises the question of whether the lines of the appealing utilities, in the areas where they would parallel East Ky. lines, could be made adequate to serve the co-ops at an expense much less than the expense of building the separate transmission lines proposed by East Ky. The record indicates that East Ky. proposes to expend some $8.6 million for its ultimate transmission system. This, added to the $12 million which the appealing utilities necessarily must spend, amounts to more than $20 million upon which Kentucky electric power consumers will be required to pay a return. It may be possible that some of the lines of the appealing utilities, which necessarily must be enlarged, expanded or replaced, and which would parallel proposed lines of East Ky., could be made adequate to serve all consumers at a cost much lower than the cost of two separate sets of lines. If so, to permit East Ky. to build a separate line would result in duplication from the standpoint of an excessive investment in relation to efficiency.

It is our opinion that the case should be remanded to the Public Service Commission for a further hearing addressed to the question of duplication from the standpoint of an excessive investment in relation to efficiency, and from the standpoint of inconvenience to the public generally, and economic loss through interference with normal uses of the land, that may result from multiple sets of right of ways, and a cluttering of the land with poles and wires.

■ If, upon such further hearing, it should develop that there will be a wasteful duplication of transmission facilities in certain areas, then the Commission should consider whether it is feasible to distribute the energy generated by the East Ky. plant over transmission lines of the appealing utilities. If the latter should be found not feasible, we believe the commission would be justified in granting a certificate for the proposed transmission lines of East Ky., because the need for service is clear.

■ By what has been said in this opinion, we do not mean to say that cost (as embraced in the question of duplication) is to be given more consideration than the need for service. If, from the past record of an existing utility, it should appear that the utility cannot or will not provide adequate service, we think it might be proper to permit some duplication to take place, and some economic loss to be suffered so long as the duplication and resulting loss be not greatly out of proportion to the need for service.

As previously indicated, we think that the findings of the Public Service Commission on the question of the inadequacy of existing service and of existing service facilities, and on the question of the economic feasibility of the proposed plan of East Ky., were proper.

■ The Commission made a specific finding that the existing generating plants and transmission lines of the appealing utilities are inadequate to supply the present and immediately foreseeable energy requirements of the co-ops, along with the requirements of the other consumers, and there is a wealth of evidence to support the finding. There was evidence of extreme voltage variations, showing an overloading of the transmission lines of the utilities. There was evidence of power failures or "outages" indicating an inadequate power supply, and inadequacy of

transmission facilities in failing to provide dual or "loop feed" service. There was evidence that the co-ops in several cases have been required to build their own transmission lines, from their load centers to tap points on the K.U. system, and that in other cases K.U. has refused or delayed for a long period of time to construct transmission lines connecting with the co-op distribution systems.

The undisputed fact that the appealing utilities import a substantial percentage of their power from outside the state establishes by itself that the generating facilities in Kentucky are inadequate to supply present demands. There is evidence that the utilities will continue to have need for imported power even if the utilities expand their generating facilities in Kentucky.

Perhaps the strongest proof of inadequacy of present facilities is found in the proposed eight-year expansion plan of K. U., filed with the Public Service Commission in connection with the hearings in this case, which calls for increasing the capacity of the generating plants of K. U. by some 300,000 KW, and for the construction of additional transmission lines. This plan, based on anticipated load growths, is a clear admission of the inadequacy of existing facilities to supply immediately foreseeable needs.

Considering now the question of whether the consumer market is sufficiently large to make it economically feasible for East Ky. to enter the field of providing service to the co-ops, leaving the balance of the market to the appealing utilities, we do not find any contention by the utilities that the market is not large enough. There is no suggestion by the utilities that their consumers, other than the co-ops, will suffer from inadequate service, or will be compelled to pay unreasonable rates, or that the utilities cannot conduct a profitable operation, if the co-op market is taken away from them. In fact, the record shows that the utilities have been charging a nonprofit rate to the co-ops, thus depending upon their other consumers for their profit. Nor do the utilities maintain that the co-op market is so small that an independent generating and transmission company could not provide adequate service to the co-ops, at reasonable rates. What the utilities do contend is that the cost to the co-ops of power purchased from East Ky. will be higher than the cost of power purchased from the utilities. They also contend that the proposed facilities of East Ky. will not provide adequate service, and that the proposed plan of East Ky. is financially unsound.

■ The Public Service Commission specifically found that East Ky., with its proposed system, can deliver electric energy to the co-ops "at a cost at least as low as their present purchase cost," and there is ample evidence in the record to support that finding.

The testimony of engineers for East Ky., based on estimated construction costs and operating costs, was that during the eight-year period from 1952 through 1959 East Ky. power would cost the co-ops $8,630,500 less than K.U. power. The appealing utilities point out that the East Ky. estimates fail to take into consideration the payments necessary to amortize the principal of the R.E.A. loan, and they argue that the amortization requirements of $5,452,371 during the designated eight-year period must be added to the estimated costs of East Ky. power. This argument overlooks the fact that the co-ops are the *owners* of East Ky., and that payments in amortization of the principal of the R.E.A. loan represent a capital investment by the co-ops as owners, rather than a cost to the co-ops as consumers. However, even if the amortization requirements should be treated as cost of service, and be deducted from the estimated saving of $8,630,500, there would still be an estimated saving of $3,200,000.

The appealing utilities argue that the East Ky. estimates of construction costs and operating costs are inaccurate and fail to take into consideration certain necessary items of expense. Particularly, it is argued that the cost of cooling towers was omitted from the estimate of the cost of construction of the generating plant; that no provision was made for the cost of buying reserve power or constructing facilities

for reserve power; that the estimate of the per-mile cost of constructing transmission lines was too low; and that the estimate of operating expenses was based only upon incomplete experiments in other states. With respect to the cooling towers, the argument is answered by evidence that cooling towers may not be necessary, and by evidence that in any event the contingency allowance in the estimate of construction costs is flexible enough to provide for cooling towers if necessary. With respect to the cost of reserve power, there was evidence of the willingness of T.V.A. to enter into an interchange of power agreement that would provide reserve power for East Ky. at no net cost. As to the cost of constructing transmission lines, and the amount of operating expenses, there was competent evidence supporting the East Ky. estimates.

Further attacking the East Ky. estimates of savings to the co-ops through the purchase of East Ky. power, the appealing utilities point out that the estimates of savings were based on the former rate schedules of the utilities, whereas, under a new rate schedule filed by the utilities while the hearings were pending before the Public Service Commission in 1950, the cost to the co-ops of buying power from the utilities, during the eight-year period from 1952 to 1959, will be $3,500,000 less than under the former rate schedules. The new rate schedule applies only to the co-ops, and follows a policy, originally approved by the Public Service Commission in 1937, of charging special "nonprofit" wholesale rates to the co-ops. In theory, former rates charged by the utilities to the co-ops have been nonprofit rates but, in the face of steadily rising costs, the utilities have made five reductions in such rates since 1937, thus indicating either that the original rates actually were not nonprofit, or that the other consumers of the utilities are paying rates that are excessive in proportion to the percentage of the plant that is devoted to serving them, or that the stockholders of the utilities are accepting less than a fair return on their investment in order to promote rural electrification. Certainly, it would be con-

trary to public policy to permit a utility to cut rates solely for the purpose of excluding competition, and while there is no evidence that the new 1950 rate schedule was designed solely to exclude the proposed competition by East Ky., nevertheless some significance must be attached to the fact that the new schedule was proposed in the middle of the hearings on the East Ky. application.

It does not appear that the new rate schedule filed by the utilities has been approved by the Public Service Commission, nor has any determination been made that this schedule meets the standards of fairness and nondiscrimination established by the commission in its 1937 administrative order which approved the first nonprofit rates for the co-ops. East Ky. maintains that in any event the new rate schedule is illusory, because of a "power factor" clause in the schedule and because there is no assurance of any permanency of the new rates.

If the new rate schedule should be accepted at its face value, and as resulting in the saving of costs which the appealing utilities represent, East Ky. power would cost the co-ops several hundred thousand dollars more than K. U. power over the selected eight-year period (assuming that amortization of the principal of the R. E. A. loan is treated as cost of service). Under all the facts and circumstances surrounding the new schedule, we are of the opinion that the Public Service Commission was justified in discounting the claimed saving of costs to result from the new schedule, and in finding that East Ky. could furnish power at rates at least as low as those of the existing utilities.

A final attack is made on the cost estimates of East Ky. because, in a new application filed with the Public Service Commission, after the order approving the initial application had been entered and while the action to review the order was pending in the circuit court, East Ky. sought authority to build additional transmission lines and another generating unit, and to borrow additional funds from R. E. A., and in the supporting data filed with

the new application East Ky. admitted that its original estimates of construction and operating costs were too low and must be increased by ten percent. The appealing utilities contend that, in comparing the cost of their service with the cost of East Ky. service, the ten percent increase must be added to the East Ky. cost estimates. This contention is conclusively answered by the fact that the evidence as to increased costs was not before the Public Service Commission upon the original application, which is the only one with which we are concerned on this appeal, and we are limited to determining whether the action taken by the commission was unlawful or unreasonable in the light of the evidence that was submitted to the commission. KRS 278.440. Whether the circuit court should have remanded the case to the commission, in order that the evidence as to increased costs might be considered by the commission, will be discussed at a later point in this opinion.

The appealing utilities maintain that the proposed plan of East Ky. makes no provision for reserve power capacity, and that on the basis of anticipated load growths the generating facilities of East Ky. will not be sufficient to supply the normal energy demands, even without regard to reserve requirements. It is therefore argued that East Ky. will not be able to render adequate service.

■ East Ky. proposed that its reserve requirements would be met by an interchange of power agreement with T. V. A., and evidence of the willingness of T. V. A. to enter into such an agreement was submitted, in the form of a letter from the power manager of T. V. A. This letter stated that T. V. A. was willing to enter into an arrangement by which it would supply the co-ops' requirements during maintenance outages of generating units, and by which it would provide "standby" power in emergencies. The letter included an offer to develop a detailed interconnection contract. The appealing utilities contend that the letter is not evidence of a binding commitment, and that it furnishes no assurance that East Ky. will have a firm supply of reserve power. We are of the

opinion that the Public Service Commission was entitled to accept the letter as evidence of a good faith offer by T. V. A., and as reasonable assurance that East Ky. would be able to secure an adequate supply of reserve power. Obviously, East Ky. could not enter into a binding contract with T. V. A. before the commission had granted a certificate to East Ky.

As regards the adequacy of the generating facilities of East Ky. to meet normal service demands, there is no contention that the facilities covered by the initial application will not be adequate to serve the co-ops which those facilities are designed to serve. The contention is that the ultimate generating plant, at the completion of the proposed development program of East Ky., will not be adequate to supply ultimate energy demands. The answer to this would seem to be that if time and experience show that more generating capacity is required, the Public Service Commission can, when the time comes, authorize additional generating facilities.

■ Upon the whole record, we cannot find that the determination of public convenience and necessity, by the Public Service Commission, was unlawful or unreasonable, except as hereinbefore pointed out with respect to duplication of transmission facilities.

Aside from the question of public convenience and necessity, the appealing utilities attack the order of the Public Service Commission on the ground that, because of the conditions and restrictions imposed by the loan agreement of R. E. A., approval of the plan of East Ky. results in an unlawful surrender or delegation by the commission of its regulatory powers. It is contended that the commission is surrendering to the Rural Electric Administrator its powers to control the issuance of securities and to regulate service and rates.

Some of the provisions of the loan agreement are: The Administrator may require that interest payments be made out of the borrowed principal, if necessary; the Administrator reserves the power to determine when the borrowed money will be paid over to East Ky.; refunding notes

shall be issued when required by the Administrator, and must be in a form and substance satisfactory to the Administrator; interest rates shall be as prescribed by the Federal statutes; supervisory operating personnel must meet with the approval of the Administrator; contracts for the supply of electric energy and for acquisition of existing facilities are subject to the approval of the Administrator; contracts for purchase or sale of electric energy must be approved by the Administrator; the East Ky. system cannot be placed in operation or energized until the Administrator assents; and extensions or additions may not be made without approval of the Administrator.

It will be observed that the foregoing provisions do not in and of themselves fix rates or regulate service, or approve obligations or securities issued by East Ky.; at the most, the provisions confer powers upon the Administrator that might be so exercised as in some way to affect rates, service or the issuance of securities or obligations.

It is elementary that the law in force when and where a contract is made forms a part of the contract, Leslie County v. Maggard, 212 Ky. 354, 279 S.W. 335, and the parties are presumed to contract with reference to existing law. Dalzell v. Bourbon County Board of Education, 193 Ky. 171, 235 S.W. 360. Therefore, it must be presumed that R. E. A. and East Ky., in their loan agreement, were contracting with full understanding and recognition that the Kentucky law as to utility regulation constitutes a part of their contract.

If the loan agreement can be construed to mean that the powers of the Administrator may be exercised only to the extent that they are not in conflict with regulations and orders of the Public Service Commission, then there is no basis for the argument that approval of the agreement by the commission constitutes a surrender of its authority. We believe the agreement can and should be so construed. It is reasonable to interpret the agreement as meaning that within the field of activities in which the regulations of the Public

Service Commission permit East Ky. to exercise freedom of action or choice of policy, the decisions of the East Ky. management shall be subject to the designated powers of the Administrator, but where the Public Service Commission requires that certain action be taken or policies pursued, leaving no discretion to be exercised by East Ky., there is no decision of East Ky. management for the Administrator to approve or reject. The powers given the Administrator by the loan agreement must be considered to be derivative; they are only such powers as East Ky., in the first instance, could exercise. Therefore, in the realm in which the authority of the Public Service Commission controls East Ky., the latter has no powers that could be passed to the Administrator by the loan agreement.

Respecting the merits of the case, the final contention of the appealing utilities is that the circuit court should have remanded the proceeding to the Public Service Commission, in accordance with the provisions of KRS 278.440, for the consideration of newly-discovered evidence. After an agreed order had been entered in the circuit court, submitting this case for final judgment, the utilities filed motion and affidavits setting forth the alleged newly-discovered evidence.

The circuit judge did not write an opinion expressing his reasons for refusing to remand the case. It is possible that his refusal was on the ground that the motion, coming after the case was submitted for judgment, was too late, and if so, we could not say that this was an abuse of his discretion. City of Milwaukee v. Public Service Commission, 252 Wis. 358, 31 N. W.2d 571. Nor, for the reasons hereinafter indicated, can we say that his action, if based upon the merits of the motion, was erroneous.

Part of the alleged newly-discovered evidence consisted of statements and contentions made by East Ky. in opposing K. U.'s application for approval of a new generating unit at its Tyrone plant. It is contended that this evidence constitutes an admission by East Ky. that K. U.'s

generating facilities are adequate. By the same token, the filing of this application by K. U. must constitute an admission by it that its facilities are not adequate. Throughout these entire proceedings, K. U. has never contended that its existing facilities are adequate to handle anticipated load growths, and we cannot see how this alleged new evidence could in any way affect the decision made by the Public Service Commission.

The other "newly-discovered evidence" consists of admissions by East Ky., in a new application filed with the Public Service Commission, seeking authority to build a second part of its ultimate proposed system and approval of an additional R. E. A. loan for that purpose, that there has been a general price increase of ten percent since the time of the hearings on East Ky.'s first application. It is argued that this proves that East Ky.'s cost figures were erroneous, and therefore East Ky. cannot furnish service as cheaply as the appealing utilities, and the original R. E. A. loan will not be sufficient to build the plant contemplated by the original application. It would seem to us that any general price increase would affect the appealing utilities' cost of service the same as that of East Ky., and that if the price increase will raise the cost of constructing the East Ky. plant it will likewise raise the cost of constructing the new plant additions by K. U. But regardless of that, if changes in the general economic situation should be permitted to be classed as newly-discovered evidence, there would never be an end to a public utility case. The Public Service Commission necessarily must base its decision and actions on the economic conditions existing at the time a case is before it, and it is not in the public interest that a case be prolonged indefinitely by allowing a reconsideration whenever there is a fluctuation in price levels.

As stated at the outset of this opinion, the appealing utilities moved to dismiss their appeal on the ground that the case has become moot because East Ky. did not commence construction of its plant within one year after the certificate of convenience and necessity was granted. The motion was accompanied by supporting affidavits, and the utilities contend that, if necessary, proof can be taken in this Court on the question of whether East Ky. did in fact commence construction within the year. East Ky. moved to strike the appellants' motion, on the ground that the court has no jurisdiction to entertain the motion.

We do not find in Kentucky law any precedent for the dismissal of a case as moot on motion of the *appellant*, against the objections of the appellee. There may be serious doubt whether this Court has jurisdiction to determine a disputed question of fact on such a motion. However, without passing on that question, we think that it would be more appropriate for the particular question of fact in this case to be determined by way of original jurisdiction in a lower tribunal. Whether that tribunal should be the Public Service Commission, or the circuit court of a county in which East Ky undertakes to act under its certificate, it would be premature for us to decide at this time. Therefore, the appellee's motion to strike the appellants' motion to dismiss is sustained.

The judgment of the circuit court, sustaining the order of the Public Service Commission, is affirmed in all respects, except in so far as it sustains that part of the order of the commission granting a certificate to construct 597 miles of transmission lines. To that extent the judgment is reversed, with directions to remand the case to the Public Service Commission for a redetermination, in accordance with the views expressed in this opinion, of the question of public convenience and necessity as related to the means and manner of distribution of the energy to be produced by the East Ky. generating plant.

SIMS and MOREMEN, JJ., dissenting.

DUNCAN, J., did not participate in the consideration of the case.

MOREMEN, Justice (dissenting).

I am not in full accord with the majority opinion and believe the portion thereof that refers the case back to the Public Service Commission to hear further proof

as to whether there will be a duplication of facilities if East Kentucky constructs the 597 miles of line is erroneous.

Under Chapter 278 of Kentucky Revised Statutes, the Public Service Commission is given broad powers over utilities both in the matter of service to be rendered and rates which might properly be charged. In this case, the Public Service Commission was presented with the question of whether a showing of facts was made that demonstrated a demand and need for the service which East Kentucky seeks to render. The Commission found that this need for service was a real one and the opinion fails to point out where it might have erred in its conclusion.

It is true that the opinion sets forth standards, some of which are new to the law of this state, but it is not demonstrated in the opinion that the Commission failed to follow these rules.

This court's function is to act as a court of review and when we set aside a finding of fact by the Commission, we should point out wherein the Commission erred. Here, the majority opinion does not say where the Commission was wrong; it merely says, in effect, "Think about these things we have written and try again."

It is pointed out in the majority opinion that the proposed eight year expansion plan of Kentucky Utilities, which was filed with the Commission and which was based on anticipated load, is a clear admission of the inadequacy of existing facilities. It is also true that for many years the appellant utility has been in a position to apply for permission to serve these undeveloped areas. I believe that its failure to serve these needy rural communities over the years, in itself, was sufficient reason for the Commission to authorize East Kentucky to serve them. But, of course, that is not properly within our province and is reserved to the Commission. In this case we believe they have already made that finding.

To my mind if East Kentucky is denied the right to construct the 597 miles of line, then it will have no adequate outlet for the power it will generate at its new plant. If this premise is correct, then there is no reason for the construction of a new plant. I recognize that under the present market it is not difficult to sell electric energy—but a plant, such as the one that will be constructed here, should not be made for the purpose of competing in the general market. Its purpose should be to serve rural communities, and, after the great investment in a power plant —which has been approved by the Commission and by this court—it should not be dependent upon future development of the lines of appellant company before it may serve the purpose for which the great investment of money was made.

I think the need for service in undeveloped rural communities outweighs consideration of several of the standards set forth in the original opinion. I therefore respectfully dissent.

I am authorized to state that Judge SIMS joins in this dissent.