**BRANDENBURG TELEPHONE COMPANY, Appellant,**

v.

**SOUTH CENTRAL BELL TELEPHONE COMPANY et al., Appellee.**

Court of Appeals of Kentucky.

March 1, 1974.

---

Louie B. Nunn, Lindsey W. Ingram, Jr., Stoll, Keenon & Park, Lexington, for appellant.

David C. Brown, Stites, McElwain & Fowler, Louisville, for appellee South Central Bell Telephone Co.

Morris E. Burton, Frankfort, for appellee Public Service Commission of Ky.

John Hopkins, Hazelrigg & Cox, Frankfort, for appellee General Telephone Co.

CULLEN, Commissioner.

In the nonmilitary sector of the Fort Knox Military Reservation, which covers portions of Bullitt, Hardin and Meade Counties in Kentucky, the Army for a number of years has operated a local telephone system. As of March 26, 1970, the system embraced 3600 stations. On that day the Army addressed a letter to the Public Service Commission of Kentucky announcing its intention to convert the system from a government-operated one to a commercially-operated one. The letter requested that the Public Service Commission determine what commercial telephone company be authorized to take over the system, and stated the Army's recognition of the jurisdiction of the Public Service Commission to grant a certificate of public convenience and necessity for the service.

Applications for authorization to take over the Army's system were made by South Central Bell Telephone Company and by Brandenburg Telephone Company. After appropriate hearings the Public Service Commission entered an order on December 15, 1970, granting the authority to South Central Bell. However, on a petition for reconsideration filed by Brandenburg the Commission, by a two-to-one vote, withdrew its first order and entered a new one, under date of December 1, 1971, granting the authority to Brandenburg.

South Central Bell appealed from the latter order to the Franklin Circuit Court, and that court entered judgment setting aside the order and directing that the original order be reentered. We have here Brandenburg's appeal from that judgment.

The majority of the Public Service Commission, in approaching the matter of selecting which company should be authorized to render the Fort Knox service, treated Fort Knox as being a *new*, uncertificated service area, so that the consideration was purely one of public convenience and necessity and each of the two companies was on the same footing in their applications. The determination was that public convenience and necessity would better be served by granting the authority to Brandenburg because:

1. The persons using the Fort Knox stations have a greater "community of interest" with the areas outside of Fort Knox now being served by Brandenburg, or to which Brandenburg could provide toll-free service (particularly Elizabethtown, now served by General Telephone Company) if Brandenburg is able to work out an agreement with General Telephone Company for such service.

2. The granting of authority to South Central Bell would contravene the so-called "Kingsbury Commitment" of 1913 in which the then vice president of A. T. & T. made a commitment to the Attorney General of the United States that neither A. T. & T. nor any of the Bell System companies would take over any other telephone company operating a service in *competition* with the Bell System.

3. The granting of authority to South Central Bell would violate federal anti-trust laws.

South Central Bell's contention, which was accepted by the circuit court, is that South Central Bell already has certificated authority to serve Fort Knox; that under the holding in Kentucky Utilities Company v. Public Service Commission, Ky., 252 S.W.2d 885, a company cannot be authorized to enter another company's certificated service area unless the latter's service is substantially inadequate; and that there has been no showing of inadequacy of South Central Bell's service. The facts supporting that contention are as hereinafter set forth.

In 1950 the Public Service Commission issued to South Central Bell's predecessor (Southern Bell) a certificate of convenience and necessity to construct a telephone exchange "in the vicinity of Fort Knox, Kentucky." Pursuant to that authority Southern Bell constructed, and South Central Bell now operates the Rose Terrace exchange in Fort Knox, which has 1285 subscribers and 400 coin telephone stations throughout the reservation. Also, all service between the Army's 3,600 stations and points outside of Fort Knox are handled by the Rose Terrace Exchange. In 1966, pursuant to a regulation of the Public Service Commission requiring telephone utilities to file maps showing their exchange service areas, South Central Bell filed a map showing the entire area of Fort Knox as being in South Central Bell's service area, and that map was approved by the commission.

■ The formal certificate issued to Southern Bell in 1950 may have been somewhat ambiguous in designating the area of authorized service as being "in the vicinity of Fort Knox," and it may be that the area of authorized service so described could not validly be *extended* simply by the ex parte filing and approval of a map. But we think the ambiguity in the designation of the area could be and was resolved or removed by contemporaneous or practical construction over the years. That construction was that South Central Bell's area did encompass all of Fort Knox, because the stations which South Central Bell installed and operated were scattered all over the reservation. No question ever was raised by any competitor as to South Central Bell's authority. The extent of South Central Bell's service in Fort Knox was limited only by the Army's choice to provide some telephone service with its own facilities.

■ Brandenburg's answer to South Central Bell's argument is that South Central Bell's certificate to serve Fort Knox was a nullity because Fort Knox is a federal enclave, over which Kentucky had ceded jurisdiction to the United States pursuant to KRS 3.030, wherefore the Public Service Commission had no jurisdiction to grant utility service authorization in the reservation. We believe the answer is not valid. In Commissioners of Sinking Fund v. Howard, Ky., 248 S.W.2d 340 (affirmed in Howard v. Commissioners of Sinking Fund, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617), this Court upheld the authority of the City of Louisville to *annex* a naval ordinance plant over which Kentucky had ceded its jurisdiction to the United States. We pointed out that the annexation did not represent an effort by the city to exercise sovereignty within the federal enclave, but merely was a matter of political geography. So, in the instant case, we think that the Public Service Commission had the authority to designate Fort Knox as a geographic area in which South Central Bell was authorized to render telephone service when and if the federal government desired the service to be rendered. We do not consider the situation materially different from that of any private property owner, whose property may be included in a utility's certificated service area but who will not be furnished service until he wants it.

■ Once it is accepted that South Central Bell already has certificated au-

thority to service the Fort Knox area, the law is settled that another utility cannot be authorized to serve the area in the absence of a showing of substantial inadequacy of existing service (which embraces a failure to extend service to new customers by normal improvements). Kentucky Utilities Company v. Public Service Commission, Ky., 252 S.W.2d 885; City of Bardstown v. Louisville Gas & Electric Company, Ky., 383 S.W.2d 918.[1] This being so, neither the "Kingsbury Commitment" nor any consideration of anti-trust violation is relevant. A further ground of irrelevance of the "Kingsbury Commitment" is that the commitment related only to taking over a competing public utility company. The Army in operating the Fort Knox system is not in that category.

The judgment is affirmed.

JONES, MILLIKEN, REED, STEINFELD and STEPHENSON, JJ., concurring.

PALMORE, J., not sitting.

---

1. Of course, in order for the certificated utility to construct a new facility amounting to more than an ordinary extension of its existing system in the ordinary course of business, the utility would have to obtain a certificate of convenience and necessity for the facility. KRS 278.020.