CITIZENS FOR ALTERNATIVE
WATER SOLUTIONS,
Appellant,

v.

KENTUCKY PUBLIC SERVICE COM-
MISSION; Kentucky American Water
Company; Louisville Water Company;
Attorney General Jack Conway; Lex-
ington–Fayette Urban County Govern-
ment; Kentucky Industrial Utility
Customers, Inc.,; Bluegrass Water
Supply Commission; and The Ken-
tucky River Authority, Appellees.

No. 2010–CA–001597–MR.

Court of Appeals of Kentucky.

Aug. 19, 2011.

Discretionary Review Denied by
Supreme Court Feb. 15, 2012.

Case Ordered Published by
Supreme Court Feb. 15, 2012.

Thomas J. FitzGerald (argued), Frankfort, KY, for appellant.

Helen C. Helton, Gerald E. Wuetcher (argued), M. Todd Osterloh, Frankfort, KY, for appellee Kentucky Public Service Commission.

Lindsay W. Ingram III (argued), Lexington, KY, for appellee, Kentucky–American Water Company.

Jack Conway, Attorney General of Kentucky, David Edward Spenard (argued), Dennis G. Howard, II, Assistant Attorney General, Frankfort, KY, for appellee, Attorney General Jack Conway.

Before TAYLOR, Chief Judge; CAPERTON and CLAYTON, Judges.

## OPINION

TAYLOR, Chief Judge:

Citizens for Alternative Water Solutions (CAWS) brings this appeal from a July 26, 2010, Opinion and Order of the Franklin Circuit Court affirming a final order of the Kentucky Public Service Commission (Commission) granting a Certificate of Public Convenience and Necessity (certificate of necessity) to Kentucky American Water Company (KAWC) for construction of a water treatment facility in Owen County. We affirm.

The facts of this case are intricate; we will, however, endeavor to present a succinct recitation of only the material facts necessary to resolution of this appeal. KAWC is a water utility company that serves the Kentucky counties of Bourbon, Clark, Fayette, Gallatin, Grant, Harrison, Jessamine, Owen, Scott and Woodford. Due to projected increases in future water demand and KAWC's inability to meet such increased demand projections, KAWC applied for a certificate of necessity with the Commission. Kentucky Revised Statutes (KRS) 278.020(1). It sought the certificate of necessity in order to construct in Owen County a new water treatment plant adjacent to Pool 3 of the Kentucky River, along with associated facilities [1] and a 30.59–mile water transmission line from the plant to its distribution system in Fayette County. CAWS intervened in the proceedings, as did Louisville Water Company, Attorney General Jack Conway, Lexington–Fayette Urban County Government, Kentucky Industrial Utility Customers, Inc., Bluegrass Water Supply Commission and Kentucky River Authority. KRS 278.020(8). Relevant herein, CAWS claimed that KAWC was not entitled to the certificate of necessity and advanced a myriad of arguments in support thereof.

After an extensive evidentiary hearing, the Commission rendered a detailed ninety-one page order granting KAWC's certificate of necessity to construct the water treatment plant, associated facilities, and pipeline. Being dissatisfied with the Commission's decision, CAWS sought review of the Commission's order with the Franklin Circuit Court. KRS 278.410(1). In another detailed order, the circuit court affirmed the Commission's order granting the certificate of necessity. Our review follows. KRS 278.450.

Because this is a review of a public service commission's order, the judi-

---

1. It appears the "associated facilities" included a raw water intake and raw water pumping station.

ciary is limited to determining whether the Commission's decision is unreasonable or unlawful. KRS 278.410(1). A decision is considered "unlawful" if it violates a statute or constitutional provision and is "unreasonable" if reasonable minds could not differ upon the evidence. *Public Serv. Comm'n v. Jackson County Rural Elec. Co–op., Inc.*, 50 S.W.3d 764 (Ky.App.2000); *Boone County Water and Sewer Dist. v. Public Serv. Comm'n*, 949 S.W.2d 588 (Ky. 1997). The Commission serves as factfinder and possesses sole discretion to judge the credibility of evidence. *Energy Regulatory Comm'n v. Ky. Power Co.*, 605 S.W.2d 46 (Ky.App.1980).

▇▇ Per KRS 278.020(1), any person or corporation providing a utility service[2] to the public shall initially obtain a certificate of necessity from the Commission before commencing construction upon "any plant, equipment, property or facility." To be entitled to such a certificate of necessity, the applicant must demonstrate a need for the proposed facility and the absence of wasteful duplication. *Ky. Utilities Co. v. Pub. Serv. Comm'n*, 252 S.W.2d 885 (Ky. 1952). A "need" may be demonstrated by "showing of a substantial inadequacy of existing service" and "wasteful duplication" may be demonstrated by showing "an excess of capacity over need," "excessive investment in relation to productivity," or "unnecessary multiplicity of physical properties." *Ky. Utilities Co.*, 252 S.W.2d at 890.

CAWS contends that the Commission improperly granted KAWC a certificate of necessity to construct the water treatment plant, associated facilities, and pipeline. In support thereof, CAWS raised a plethora of allegations of error:

I. KAWC failed to demonstrate the need for the new water treatment plant and associated transmission facilities.

   A. The Commission acted unreasonably and unlawfully in failing to resolve the significant discrepancy between KAWC's projected water demand and KAWC's historic usage trends.

   B. The Commission erred in issuing a CPCN [Certificate of Public Convenience and Necessity] authorizing construction of facilities intended to meet unreasonable customer demand during the drought of record.

   C. The Commission acted unreasonably in issuing the CPCN without first requiring implementation of demand management measures and leak detection.

   D. The Pool 3 project would constitutes [sic] a wasteful duplication of facilities since the applicant failed to evaluate reasonable supply alternatives exist that in combination could address KAWC's supply and treatment needs.

II. The Commission erred in approving the KAWC proposal over other alternatives on the basis of the status of the proposed project implementation.

III. The Commission erred in concluding that the KAWC project is consistent with regional planning goals.

IV. The Commission erred in relying on the Kentucky River as a water source as a basis for approving the KAWC project.

CAWS Brief at iii-v. For the reasons hereinafter stated, we agree with the cir-

---

2. Under KRS 278.010(3)(d), a utility service includes the pumping or distributing of water to the public for compensation.

cuit court and are unable to find any merit in the above allegations of error.

■ To begin, KAWC is legally mandated to supply water in sufficient amounts to satisfy the "total reasonable requirements of its customers under maximum consumption." 807 Kentucky Administrative Regulations (KAR) 5:066 Section (10)(4)(2011); *see also* KRS 278.010(14). To meet this mandate in light of the projected increase in future water demand of KAWC's customers, the Commission found that the new treatment facility at Pool 3 located on the Kentucky River was needed and would not result in a wasteful duplication of facilities.[3] *See Ky. Utilities Co.*, 252 S.W.2d 885; *Ky. Utilities v. Public Serv. Comm'n*, 390 S.W.2d 168 (Ky.1965). A review of the record reveals that the evidence before the Commission was conflicting. However, we are unable to conclude that the Commission's decision was either unreasonable as to the evidence or unlawful as violative of statute or constitutional provision. And, all of CAWS allegations of error were painstakingly addressed by the circuit court in its well-reasoned and well-written opinion. As we could add little to the circuit court's resolution of CAWS allegations of error, we adopt same herein:

The plaintiff, CAWS, argues that the PSC [Kentucky Public Service Commission] Order should be reversed as unlawful and unreasonable for several reasons. CAWS argues that the PSC erred in issuing the CPCN [Certificate of Public Convenience and Necessity] to KAWC because KAWC failed to adequately demonstrate the need for the new treatment plant and associated transmission main. Specifically, CAWS urges that the "need" requirement was not met because the need for additional

water supply and water treatment capacity was overestimated and KAWC focused exclusively on one supply-side option rather than evaluating a range of options that could satisfy the reasonable needs of KAWC customers at a lower cost. In terms of the reasonableness of the projections of future water demand, CAWS asserts that this was overstated and that the PSC acted unreasonably and unlawfully in failing to resolve discrepancies between the projected water demand figures that KAWC utilized and the historic water usage trends used by Dr. Martin Solomon who testified on behalf of CAWS before the PSC. The Attorney General points out that the PSC's acceptance of KAWC's projections and its decision to accord little weight to the testimony of Dr. Solomon is entirely within the province of the agency and that indeed Dr. Solomon's testimony supports the view that KAWC's projections fall within a range of reasonableness. KAWC argues that there is abundant evidence in the record to support the PSC's conclusion that the "need" factor is met here. The PSC asserts that it was reasonable and within its authority to afford little weight to the demand projections put forth by KAWC and that the PSC, as fact[-]finder, had the sole discretion to determine the credibility of witnesses and pass on the weight of the evidence.

CAWS further asserts that the PSC acted unlawfully and unreasonably by failing to ensure that the KAWC proposal would not result in excess capacity and wasteful duplication by failing to incorporate substantial conservation measures in planning for the drought of record and thus utilizing unreasonable

---

**3.** Specifically, the Kentucky Public Service Commission found that Kentucky American Water Company lacked sufficient capacity

and supply "to meet reasonable maximum projected customer demands under normal conditions or in a drought of record."

demand projections. CAWS asserts that KAWC need not plan for unreasonable demand even during a drought of record and that no real restrictions were proposed related to conservation during such a drought other than restrictions on outdoor water use. KAWC responds that the PSC was correct in its determination that the facilities are reasonable under existing and foreseeable circumstances and that independent consultants concluded that this solution ensures adequate supply and is the least cost alternative.

The Attorney General points out that moderate restrictions during a severe drought were incorporated into the KAWC projections and that the issue of the appropriate level of restrictions for planning is a policy decision for the PSC to make rather than the courts. The PSC asserts that substantial evidence indeed supports its finding that KAWC's existing water supply and treatment facilities are inadequate, particularly in a drought of record scenario. It points to KAWC witness Linda Bridwell who testified that KAWC's projections incorporated conservation efforts and moderate restrictions during a severe drought.

CAWS also argues that it was unreasonable for the PSC to approve a new 20 MGD treatment plant without first requiring assessment and implementation of all reasonable and cost-effective demand management measures and a more aggressive program of leak detection. Essentially, CAWS urges that "normal improvements in the ordinary course of business" could be used to address the projected treated water deficit in lieu of the construction of a new plant. The PSC counters that implementation of demand management and leak detection measures would not sufficiently eliminate the supply deficits or the need for new facilities because

KAWC customers could still face shortages if a severe drought were to occur. In its Order, the PSC noted that a witness who testified for the Attorney General, Scott Rubin, indicated that demand management measures could not eliminate KAWC's supply deficit, particularly under drought conditions. The Attorney General similarly points out that a substantial inadequacy of existing service was demonstrated to the PSC and that the measures that CAWS refers to would not eliminate the need for a water supply project and additional treatment. (Citation omitted.)

CAWS asserts that the KAWC project would constitute a wasteful duplication of facilities because there are reasonable, lower cost alternatives that were not adequately evaluated. Specifically, CAWS argues that the pipeline proposal put forth by the LWC [Louisville Water Company] is superior to the KAWC project, as it would only require water customers to pay for incremental increases in water use and would provide another source of supply from the Ohio River. CAWS also asserts that there was no meaningful exploration of the feasibility of purchasing treated water from Versailles nor of the impact of the installation of crest gates on Dam 9 of the Kentucky River.

The PSC rejected these arguments, and the administrative record supports a finding that the alternatives were adequately studied. The PSC made findings that none of the options advanced by CAWS would resolve either the maximum daily demand deficit or the drought demand deficit. The Attorney General similarly points to the administrative record demonstrating that KAWC was reasonably diligent in considering alternatives. With respect to the installation of crest gates on Dam 9,

one of the witnesses for CAWS testified that it was unknown whether the KRA [Kentucky River Authority] would install a crest gate by 2018. The Attorney General also points to the previous PSC case No. 93–434 where the PSC determined that a crest gate on Dam 9 would be insufficient and this finding was not contested by the KRA. Thus, KAWC cannot be faulted for failing to explore this option.

With regard to the LWC proposal, the Attorney General persuasively argues that ample consideration was given by the PSC to this option. The PSC found that the cost of the LWC proposal and the cost of the KAWC proposal were roughly the same, and this finding is supported by evidence in the administrative record. Therefore, the Court cannot substitute its judgment for that of the PSC. The PSC had to endorse either the KAWC option (which was fully developed and ready to be implemented) or the LWC option (that was still in the developmental stage and subject to many uncertain contingencies). With regard to the Versailles option, the record shows that the PSC rightfully concluded that this is not a viable solution due to drought restrictions in the Versailles water withdrawal permit, thus indicating that the quantity of water that might be available from Versailles is likely very limited.

CAWS further asserts that the PSC erred in choosing the KAWC proposal over the LWC proposal based on using a flow rate for the KAWC project that was not supported in the record, leading the net present value of the KAWC proposal to be much higher than that of the LWC project. Specifically, CAWS argues it was inappropriate for the PSC to assume a flow rate of 10 MGD in calculating the flow rate for the Pool 3 project in the face of evidence that the

minimum anticipated flow rate would only be 6 MGD. The PSC's Order dedicated 28 pages to the performance of an independent net present value ("NPV") analysis, which indicated that the cost of the KAWC project· was only slightly higher than the LWC proposal. While analysis of the cost of the Pool 3 project was based on actual available construction bids, that of the LWC project was based primarily on assumptions which the Order pointed out were conservative in nature. The Attorney General noted that the PSC found it necessary to use a flow rate of 10 MGD in analyzing the NPV of the LWC proposal and thus it was reasonable for the PSC to compare NPV's for the two projects using the same flow rate. The Attorney General's brief also points out that use of the 10 MGD flow rate for the KAWC proposal actually worked in favor of the LWC, because it increased the net present value of the KAWC proposal, thus any error alleged by CAWS did not result in any prejudice. In addition, KAWC emphasizes the fact that the KAWC proposal was premised on the fact that the facilities would be needed not only for normal conditions but also in a drought of record situation, thus requiring KAWC to ensure that it can purchase half of the amount of water capacity that the facilities have (thus, the 10 MGD figure). (Citation omitted.)

CAWS argues that the PSC unlawfully and unreasonably accorded controlling weight to the KAWC proposal as opposed to other alternatives based on KAWC having already taken actions to advance and implement their plan. To bolster this assertion, CAWS relies on the PSC conclusion that KAWC's proposed facilities "represent a cost-effective approach to resolving Kentucky–American's supply deficit that can be

immediately implemented with few regulatory or financial risks." CAWS also characterizes the PSC Order as having credited the actions that KAWC had taken toward implementing its proposal as reasons for approving that alternative and points to the PSC's comments with regard to the LWC proposal being "a concept that requires considerable work and is rife with uncertainty and risk." The PSC responds that its Order does not specifically accord any weight to the KAWC project based on its level of development and that to prevent prejudice, conservative assumptions were used in assessing the LWC proposal that would mitigate the financial impact from the later operational date as compared with that of KAWC. The PSC recognizes that it conducted an assessment of the relative financial and regulatory risks associated with the two proposals and asserts that this is neither unfair nor unreasonable, as the agency is not required to provide the exact same level of review and preparation for all proposed alternatives. The Attorney General points to the PSC's Order of June 5, 2008[,] denying CAWS' petition for rehearing, where the PSC made a specific finding that the LWC alternative was given a fair, comprehensive evaluation. (Citations omitted.)

CAWS also asserts that the PSC failed to adequately consider landowner opposition to construction of the KAWC transmission line over private lands. It finds error in the fact that the PSC Order concluded that the KAWC proposal had fewer financial and regulatory risks despite the fact that many of the private easements necessary for completion of the project had not been granted and it may have been doubtful that KAWC could condemn any of the private land. Essentially, CAWS argues that it was inappropriate and unlawful for the PSC to accord any weight to the fact that KAWC had already acquired needed permits and easements. The PSC concedes that in its Order, it found that the KAWC proposal was subject to less financial and regulatory risk than that of the LWC because of the advanced developmental stage of KAWC's plans (specifically, the KAWC transmission main had been designed and most of the necessary regulatory approvals had been obtained). However, the PSC argues that it did not consider or give any weight to potential easement acquisition problems for either the KAWC or the LWC project, and that any mention of easement issues was merely to illustrate the differences in the relative stages of development of the proposals. The PSC also cites the Franklin Circuit Court decision in *Kentucky–American Water Co. v. Felgendreher*, 08–CI–2058, (July 29, 2009) for the proposition that KAWC indeed has the authority to condemn land for the purpose of supplying water. It is essentially undisputed that PSC lacks jurisdiction to determine the applicability of Kentucky statutes to KAWC's efforts to condemn private lands. (Citation omitted.)

CAWS also finds error with the PSC conclusion that the KAWC project is consistent with regional planning goals, asserting that the administrative record does not support this finding. KAWC asserts that its proposal included an option for BWSC [Bluegrass Water Supply Consortium] to purchase 20% of the facilities, and while this option was not exercised, the facilities were designed to allow for additional capacity in case the BWSC wants to partner with KAWC in the future. KAWC submits that the PSC's lengthy discussion in its Order of the historical background of the efforts made by KAWC and the BWSC to work

together toward a regional water supply solution provides evidence in the administrative record that the KAWC proposal was consistent with regional planning goals. The PSC similarly emphasizes its lengthy discussion of the historical background to KAWC's current efforts and specifically the fact that KAWC only took a lead role in developing a solution to the water supply problems when the BWSC was unable to secure necessary funding for construction of a water treatment plant. The Attorney General notes that it was entirely appropriate for the PSC to make the qualitative conclusion that the KAWC proposal represents a significant effort to address the region's water supply problems and there was no error in the PSC's mere discussion of the cooperative efforts that were made prior to the ultimate decision by KAWC to propose the Pool 3 project.

Finally, CAWS asserts that the PSC, in granting the CPCN, unlawfully relied on the misplaced assumption that the LWC proposal would adversely affect the revenue stream of the KRA because it would use the Ohio River as a supplemental source of supply. CAWS feels that this reliance is evident in the PSC's conclusion that the KAWC facilities are consistent with "use of the Kentucky River" and that the PSC went beyond its statutory authority by instead citing "broader policy support for authorizing construction of the [KAWC] facilities." The PSC points to the language of its Order and the express statement that the potential loss of revenue to the KRA that could result from the LWC project played no role in the PSC's ultimate conclusions pursuant to its statutory mandate to determine need and the absence of wasteful duplication in issuing a CPCN. Rather, the PSC's comments regarding KRA revenues were simply part of its concluding remarks and were not part of its analysis of the KAWC proposal. The Court cannot find any basis for reversal of the decision in the PSC's passing reference to the KRA in this regard. (Citation omitted.)

In sum, we hold that the Commission's granting of the certificate of necessity was neither unreasonable as to the evidence nor unlawful as violating any statute or constitutional provision. Rather, we agree with the circuit court that more than ample evidence supported the Commission's decision and that the Commission committed no error of law in granting KAWC the certificate of necessity.

For the foregoing reasons, the Opinion and Order of the Franklin Circuit Court is affirmed.

ALL CONCUR.