**KENTUCKY UTILITIES COMPANY et al.,**
**Appellants,**

v.

**PUBLIC SERVICE COMMISSION**
**of Kentucky, et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 26, 1965.

Rehearing Denied June 4, 1965.

Malcolm Y. Marshall, Ogden, Robertson & Marshall, Louisville, Clifford E. Smith, Smith, Reed, Yessin & Davis, Frankfort, William L. Wilson, Wilson & Wilson, Owensboro, for appellants.

J. Gardner Ashcraft, Public Service Comm., Louis Cox, Hazelrigg & Cox, Frankfort, Julian M. Carroll, Emery & Carroll, Paducah, for appellees.

CULLEN, Commissioner.

The appeal is from a judgment of the Franklin Circuit Court upholding an order of the Public Service Commission granting a certificate of convenience and necessity to Big Rivers Rural Electric Cooperative Corporation (hereinafter "Big Rivers") for the construction of certain electric generating and transmission facilities, and granting authority to borrow money from a federal agency for the cost of the facilities. The appellants, who were protestants in the proceedings before the Public Service Commission, are Kentucky Utilities Company (hereinafter "KU"), Louisville Gas and Electric Company (hereinafter "LG&E"), City Utility Commission of the City of Owensboro (hereinafter "OMU"), and the City of Owensboro.

Big Rivers was organized in 1961 under KRS Chapter 279 for the purpose of generating and transmitting electric energy for its members, which are the following three rural electric cooperatives which for a number of years have been distributing electric energy in western Kentucky: Henderson-Union Rural Electric Cooperative Corporation (hereinafter "Henderson-Union"), Green River Rural Electric Cooperative Corporation (hereinafter "Green River"), and Meade County Rural Electric Cooperative Corporation (hereinafter "Meade County").

Big Rivers' application to the Public Service Commission was made in 1962. It sought a certificate of convenience and necessity authorizing: (1) The construction of a steam generating plant with a capability of 75,000 KW, designed to supply the generating needs of Henderson-Union and Green River commencing in 1966, and the needs of Meade County commencing in 1969; (2) the construction of transmission lines from the generating plant to the lines or load centers of Henderson-Union and Green River, to commence service in 1966; and (3) an interconnection line between its generating plant and power-producing facilities of South-

eastern Power Administration (hereinafter "SEPA") at Barkley Dam, also to commence service in 1966. The application also sought an authorization to borrow the cost of the proposed system ($18,000,000) from a federal agency. The application was granted by the Public Service Commission as made.

At the time the application was made Henderson-Union and Green River were being supplied with power by KU, and Meade County was being supplied by LG&E. Henderson-Union and Green River were in a position to, and did, make commitments with Big Rivers to buy power from Big Rivers commencing in 1966, but Meade County had a contract with LG&E extending through 1968, so it could make no commitments with Big Rivers for service prior to 1969. However, Meade County did enter into a contract with Big Rivers to buy power commencing in 1969. The capacity of the proposed generating plant of Big Rivers is designed to accommodate the needs of Meade County, but no authority was sought in the instant proceeding to construct transmission lines to serve Meade County.

The most vigorous attack of the appellants is upon the finding of the Public Service Commission that there is an inadequacy of existing service. However, applying to the facts of this case the principles enunciated in Kentucky Utilities Co. v. Public Service Commission, Ky., 252 S.W.2d 885 (hereinafter "East Kentucky"), we conclude that the attack must fail.

 One of the alternative tests of inadequacy stated in East Kentucky is "a substantial deficiency of service facilities, beyond what could be supplied by normal improvements in the ordinary course of business" (252 S.W.2d @ 890). The deficiency is not to be measured by the needs of the particular instant, but by "immediately foreseeable needs" (252 S.W.2d @ 893). Clearly, in view of the substantial period of time required to construct and place in operation a major electric service facility,

the immediately foreseeable future may embrace a number of years. We said, in East Kentucky (252 S.W.2d @ 893):

"Perhaps the strongest proof of inadequacy of present facilities is found in the proposed eight-year expansion plan of K.U., filed with the Public Service Commission in connection with hearings in this case, which calls for increasing the capacity of the generating plants of K.U. by some 300,000 KW, and for the construction of additional transmission lines. This plan, based on anticipated load growths, is a clear admission of the inadequacy of existing facilities to supply immediately foreseeable needs."

In the instant case the evidence showed that KU planned to add 165,000 KW of generating capacity in 1967, and another 165,000 KW in 1970, or a total of 330,000 KW in a period of eight years from the date of Big Rivers' application, or four years from the date of Big Rivers' proposed commencement of operations. In addition, LG&E will need an additional 180,000 KW unit in 1966, and OMU plans to add a 151,000 KW unit in 1968. Actually, the 10-year programs of the protesting utilities, taken together, call for the adding of 1,700,000 KW of generating capacity. KU states that its proposed new 165,000 KW unit planned for 1967 will be necessary whether or not the Big Rivers plant is built.

The situation with respect to needs of the immediate future for transmission facilities is similar. For example, KU planned substantial extensions of its transmission facilities, in the West Kentucky area, by 1968. New load centers will require service, and many existing load centers do not have direct power delivery.

The appellants maintain that their planned additions of generating and transmission facilities should be classed as "normal improvements in the ordinary course of business." However, they concede that they would be required to obtain certificates

of convenience and necessity for the construction of these facilities, which concession puts them in an untenable position, because under KRS 278.020 a certificate is not required for the construction of "ordinary extensions of existing systems in the usual course of business." In our opinion major facilities of the size contemplated cannot be considered to be mere ordinary extensions or normal improvements within the meaning of the statute or within the meaning of the rule laid down in East Kentucky.

■ Actually, everyone in this case agrees that the existing service facilities are inadequate to meet the needs of the immediately foreseeable future. Although the appellants undertake to argue that there is no inadequacy, the real import of their argument is that the existing utilities, rather than a newcomer, should be allowed to supply the inadequacy. The question of who should be permitted to supply the inadequacy is involved in this case, in the overall consideration of public convenience and necessity, but the fact that the existing utilities are willing and able to supply the inadequacy by major additions to plant does not negative the existence of the inadequacy.

As their second argument, the appellants maintain that the proceedings before the Public Service Commission were premature and should have been dismissed because (1) the Big Rivers plant will not be economically feasible unless it serves Meade County; and (2) the question of whether Rig Rivers will be permitted to serve Meade County when its existing contract with LG&E expires in 1969 must be determined by a subsequent application.

■ As we view it, the question of whether the consumer market in the immediately foreseeable future will be sufficiently large to make it economically feasible for a proposed system or facility to be constructed (this is mentioned in East Kentucky as a significant factor for con-

sideration) is not one which must be answered with absolute certainty; it is sufficient that there is a reasonable basis of anticipation. In our opinion, Meade County's being available as a market for Big Rivers' power could, under the circumstances of this case, be anticipated with sufficient reasonableness to warrant authorization for construction of a plant by Big Rivers designed to accommodate the needs of Meade County. And we think that in view of the long range planning necessary in the public utility field, an anticipation in 1966 of the needs of 1969 is not too remote. Furthermore, it would appear that even if Big Rivers were not granted authority to serve Meade County, the resulting temporary excess capacity of the Big Rivers generating plant could be utilized by the existing utilities (whose needs will constantly be growing), just as KU now utilizes the excess capacity of the OMU plant. It may be pointed out that the anticipation by OMU, in planning its 1964 plant, of serving Green River and Henderson-Union was not fulfilled but nevertheless there is an adequate market for the power from the 1964 plant.

■ Several arguments are made by the appellants with respect to the overall feasibility of the Big Rivers proposal. One is that the system would not be sufficiently dependable because initially it will have only one interconnection with a source of emergency or stand-by power, and peaking power. In our opinion the evidence as to the possibilities of the Big Rivers plant and the interconnection source having simultaneous outages or failures was not such as to indicate any serious danger of a complete failure of service, and therefore the Public Service Commission was justified in finding that there was a reasonable assurance that Big Rivers will have an adequate supply of reserve power.

■ Another argument addressed to feasibility is that Big Rivers cannot supply power at a cost as low as that of the existing utilities. The evidence for Big Rivers

would warrant a finding that the cost of Big Rivers power will be substantially lower than present costs. At the most, the evidence for the existing utilities shows only that they might supply power for a few cents less per KWH than could Big Rivers. The rates of Big Rivers would be reasonable on the basis of any appropriate standard. In our opinion, as concerns feasibility, no more is required.

■ It is argued by OMU that Big Rivers' entire case, as concerns feasibility, rested upon a Power Load Study about which a Mr. Brown testified, and that his testimony was incompetent because the study was not prepared by him or by persons working under his supervision. We think the contention is without merit because: (1) Mr. Brown testified that he was responsible for making the original estimates upon which the Power Load Study was prepared; that the estimates subsequently were checked by field men (not working directly under him) and they verified all of his estimates except in one minor respect; (2) the Public Service Commission is not bound by strict rules of evidence; (3) there is no showing that there is any probability of error in the study or that an opportunity to cross-examine the field men would have been of any significant value; and (4) the circumstances of the preparation of the study were such as to warrant its being accorded reasonable reliability. Furthermore, it appears that the Power Load Study was addressed primarily to showing the existence of a sufficient consumer market, and there really is no serious contention in this case that the consumer market will not be sufficient to make the Big Rivers plan feasible.

■ The appellants argue that the construction of the Big Rivers plant will result in wasteful duplication which, as defined in East Kentucky, embraces an excess of capacity over need, an excessive investment in relation to productivity or efficiency, or an unnecessary multiplicity of physical properties.

■ There is really no basis for any argument that there will be an excess of capacity over need. As concerns transmission lines there is evidence that the main transmission lines of the existing utilities will have use to their full capacity without serving the distribution cooperatives, and that if Big Rivers were not permitted to operate the distribution cooperatives would be required to construct a large number of miles of tap-on lines. As concerns generating facilities, there is an admitted inadequacy of existing facilities. KU argues that its new 165,000 KW plant, proposed to be constructed in 1967, will be needed regardless of whether the Big Rivers plant is built, but at the same time KU says its new plant will provide enough capacity to serve the cooperatives and KU's other loads. We have a little trouble following that argument. It appears to us that if the new KU plant will be needed regardless of the cooperatives' needs, its ability to serve the cooperatives in addition to KU's other loads could be only of a short duration. That this is true is indicated by evidence that KU could avoid having an excess of capacity simply by postponing the construction of its new plant for one year.

■ With respect to an excessive investment in relation to productivity or efficiency, the main argument is that the existing utilities can expand their facilities, to meet the continuing needs of the cooperatives, at a cost considerably lower than the cost of the Big Rivers system. As concerns generating facilities the argument is not valid because the proof does not show that the existing utilities can build generating plants more cheaply than can Big Rivers. It may be that the cost of the portion of KU's proposed 1967 generating plant that could be devoted to supplying the needs of the cooperatives would be less than the cost of Big Rivers' entire plant, but as hereinbefore pointed out, this would relate only to a temporary saving and would have little significance in the long range picture. It may be also that large

plants can produce power at a lower unit cost than small plants, but unless the difference in cost assumes major proportions (which is not shown here) there cannot be said to be a wasteful inefficiency in the small plant. As concerns transmission facilities it is argued that KU could expand its transmission lines sufficiently to meet the needs of the cooperatives at a cost of some $1,800,000, whereas Big Rivers proposes to spend some $5,500,000 for transmission lines. These cost comparisons are not entirely valid, because the Big Rivers costs embrace facilities that would not be provided by the KU plans, and some of the costs, such as those for the interconnection line with SEPA, might more properly be classed as generating costs rather than transmission costs. In any event, as pointed out in East Kentucky, cost is only one factor to be considered. Other questions are (1) will the lines parallel each other (if not, there is no duplication); (2) would it be feasible to distribute Big Rivers power over KU lines; and (3) would such service be adequate? The record is not such as to require affirmative answers to the latter questions. For example, there is evidence that the proposed KU lines would not provide for delivery of power directly to the load centers of the cooperatives, and in a number of instances would not meet high voltage needs. Actually, no one seriously suggests in this case that it would be feasible to distribute Big Rivers power over KU lines. The evidence warrants the conclusion that the overall investment in the Big Rivers system, as a unit, will not be excessive in relation to productivity or efficiency, so the possible fact that one part of the system, if taken alone, would involve an excessive investment is not important if, as is the case here, that part is not feasibily separable. It is our conclusion that the Public Service Commission was warranted in finding that there will be no duplication from the standpoint of excessive investment.

There is no real contention that there will be a duplication from the standpoint of a multiplicity of physical properties.

■ It is contended by KU that economic waste will result from the construction and operation of the Big Rivers plant because the expansion of publicly owned power facilities (1) places the privately owned utilities in a less favorable position in the money market, increasing their financing costs, and (2) hinders the growth of unified, single power systems. However, there is no suggestion that this will result in any serious rate disadvantage to the consumers of the existing utilities. In substance the argument is that competition is bad in the public power field and that the public interest is best served through a large regulated monopoly. While it may be conceded that a large monopoly is in theory capable of rendering cheaper and more efficient service, there are other considerations that enter into the question of whether the monopoly system best serves the public interest. There has been no declaration of public policy of this state that the type of ownership that will provide the lowest rates is the only type of ownership that will be permitted to operate a utility service. See Public Service Commission v. Cities of Southgate, etc., Ky., 268 S.W.2d 19. Whether, in the overall public interest, competition has advantages that offset those of monopoly is a question our legislature has chosen to leave to the decision of the Public Service Commission.

■ It is argued by OMU that the consumers in Owensboro will be subjected to an additional cost of $260,000 as a result of construction and operation of the Big Rivers plant, and that this shows that the Big Rivers project will cause economic waste. It appears that the claimed additional cost will grow out of fixed charges incurred or to be incurred by OMU in anticipation of the construction of a new generating unit which OMU had planned for 1968, but which might be delayed until

1971 by reason of the Big Rivers project. OMU says that in order to prevent a temporary excess of capacity it will be required to delay for perhaps three years the construction of its new unit in anticipation of which it already has incurred fixed charges for land, water supply, railroad facilities, etc. Assuming that OMU had made definite plans to construct the new unit in 1968 (the record indicates that the plans were far from definite and that the ultimate decision to build would be made by KU), it would appear that the solution to OMU's problem would be to delay for three years the construction of the Big Rivers plant. However, the evidence indicates that this would deprive the cooperatives of substantial savings in costs. Also, it seems that the claimed cost to the Owensboro consumers is attributable to the terms of OMU's contract with KU, and that if the Owensboro consumers lose, the KU consumers gain. When we consider all of the consumers involved we are not convinced that there will be any significant net economic loss from the immediate construction of the Big Rivers plant.

OMU maintains that an addition to its generating plant, completed in 1964, has enough capacity to serve the needs of Owensboro and of Green River for perhaps 10 years in the future. However, KU has contracted to buy, and it will have a market for, all power from the OMU plant in excess of the needs of Owensboro, so there will be no unused capacity in the plant even if the cooperatives do not use OMU power.

KU contends that the Public Service Commission did not make adequate findings of fact and did not apply proper standards. We have examined carefully the Commission's order and in our opinion it embodies all essential findings of fact and applies proper standards.

By way of conclusion it may be said that the basic issue in this case is whether, in a situation of inadequacy of existing facilities to supply immediately foreseeable needs, the existing utilities should be allowed to supply the inadequacy to the exclusion of a newcomer. As we view it, if the newcomer's proposal is feasible (capable of supplying adequate service at reasonable rates) and will not result in wasteful duplication, the Public Service Commission is authorized to grant a certificate to the newcomer. The Commission is not restricted to making a close comparison of whose rates will be lowest and whose service will be most efficient. Cf. Public Service Commission v. Cities of Southgate, etc., Ky., 268 S.W.2d 19. The existing utilities have no absolute right to supply the inadequacy. East Kentucky. Nor do they have any right to be free of competition. Tennessee Electric Power Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543.

Upon the whole record we cannot find that the determination of public convenience and necessity in this case, by the Public Service Commission, is unlawful, unreasonable or without adequate factual support.

The judgment is affirmed.