RENDERED: APRIL 19, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0338-MR

CITY OF PIKEVILLE             APPELLANT

v.
     APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE THOMAS D. WINGATE, JUDGE
ACTION NO. 20-CI-00190

PUBLIC SERVICE COMMISSION OF
KENTUCKY; AND MOUNTAIN WATER
DISTRICT             APPELLEES

OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE: ACREE, GOODWINE, AND JONES, JUDGES.

JONES, JUDGE: The City of Pikeville ("Pikeville") appeals a judgment of the

Franklin Circuit Court affirming an order of the Public Service Commission

("Commission") that adjusted Pikeville's water rate to $1.97 per 1,000 gallons for

Pikeville's two wholesale customers, Mountain Water District ("MWD") and

Southern Water and Sewer District ("Southern"). Pikeville asserts the Commission denied it due process because: (1) the Commission applied this adjustment to its wholesale rate for Southern, which Pikeville believes should not have been at issue in the underlying administrative proceedings; (2) the Commission directed MWD and Southern – rather than only MWD – to pay for Pikeville's allowable rate case costs; and because (3) the wholesale water rate the Commission set was, in Pikeville's view, confiscatory. As set forth below, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this Opinion.[1]

## I. Background

We will briefly review some of the applicable law and general facts of this appeal before delving into the issues presented. MWD and Southern are statutorily created public water districts operated and regulated pursuant to Kentucky Revised Statutes ("KRS") Chapter 74 and are expressly subject to the jurisdiction of the Commission, which is operative under KRS Chapter 278. MWD and Southern both purchase wholesale water from Pikeville, which operates and maintains a municipal waterworks by virtue of the provisions of KRS 96.320 through .510. Ordinarily, municipalities such as Pikeville that operate and

---

[1] In its appellee brief, MWD asks this Court to take judicial notice of various filings with the Commission indicating that since December 1, 2022, Pikeville effectively adjusted its wholesale rates for MWD and Southern to $2.26 per 1,000 gallons. We will not address this recent development, assuming it occurred, because it is beyond the scope of our review.

maintain waterworks are exempt from regulation by the Commission. *See* KRS 278.010(3)(d). However, where, as here, "contracts have been executed between a utility and a city . . . KRS 278.200 is applicable and requires that by so contracting the City relinquishes the exemption and is rendered subject to the [Commission] rates and service regulation." *Simpson Cnty. Water Dist. v. City of Franklin*, 872 S.W.2d 460, 463 (Ky. 1994). In short, the Commission has jurisdiction over Pikeville's rates for wholesale water service to MWD and Southern. The purpose of the Commission's jurisdiction over a municipal utility's wholesale transactions with a public utility is to ensure that any public utility "consumer/customer that has contracted and become dependent for its supply of water from a city utility is not subject to either excessive rates or inadequate service." *Id*. at 465.

To secure approval of proposed rate adjustments to public utilities, city-owned utilities must file a "tariff" (*i.e.*, proposed rate[2]) with the Commission. And, because the requirements and procedures set forth in KRS Chapter 278 and the Commission's regulations apply equally to filings by a city-owned utility or a jurisdictional utility in this circumstance, municipal wholesale water rates charged to jurisdictional utilities are subject to KRS 278.030, KRS 278.040, KRS 278.170, KRS 278.260, and KRS 278.270. Under these provisions, the Commission has the

---

[2] *See* KRS 278.010(12) ("'Rate' means . . . any schedule or tariff or part of a schedule or tariff thereof[.]").

authority and obligation in any ensuing rate case to investigate whether any rate is fair, just, reasonable, and not unduly discriminatory. If any rate fails those metrics, the Commission is authorized to prescribe a fair, just, and reasonable rate to be followed in the future. To be clear, rate cases are extensive by design. "A general rate case pursuant to KRS 278.190 is a lengthy procedure in which a new base rate is approved only after thorough examination of *all* operations and costs by the [Commission]." *Kentucky Indus. Util. Cust., Inc. v. Kentucky Util. Co.,* 983 S.W.2d 493, 497 (Ky. 1998) (emphasis added).

Our standard of review regarding decisions of the Commission is as follows:

> Judicial review of orders issued by the Commission is governed by KRS 278.410(1). A court may vacate or set aside an order or determination by the Commission only where the Commission's decision is determined to be "unlawful or unreasonable." *See* KRS 278.410(1); *Citizens for Alt. Water Sol. v. Kentucky Pub. Serv. Comm'n*, 358 S.W.3d 488, 489-90 (Ky. App. 2011). The party seeking to set aside the Commission's determination has "the burden of proof to show by clear and satisfactory evidence that the [Commission's] determination, requirement, direction or order is unreasonable or unlawful." KRS 278.430.
>
> A decision is considered "unlawful" if it violates a statute or constitutional provision. *National-Southwire Aluminum Co. v. Big Rivers Elec. Corp.*, 785 S.W.2d 503 (Ky. App. 1990); *see also Public Serv. Comm'n v. Jackson Cny. Rural Elec. Co-op., Inc.*, 50 S.W.3d 764 (Ky. App. 2000). An order of the Commission "can be found unreasonable only if it is determined that the

evidence presented leaves no room for difference of opinion among reasonable minds.  In making such a review, the court is confined to a consideration of the evidence as presented in the record."  *Kentucky Indus. Util. Cust., Inc. v. Kentucky Util. Co.*, 983 S.W.2d 493, 499 (Ky.1998) (citing *Energy Reg. Comm'n v. Kentucky Pwr.*, 605 S.W.2d 46 (Ky. App. 1980)).

The Commission serves as fact-finder and possesses sole discretion to judge the credibility of evidence. *Energy Reg. Comm'n*, 605 S.W.2d at 50.  "The [Commission] acts as a quasi-judicial agency utilizing its authority to conduct hearings, render findings of fact and conclusions of law, and utilizing its expertise in the area and to the merits of rates and service issues."  *Simpson Cty. Water Dist. v. City of Franklin*, 872 S.W.2d 460, 465 (Ky. 1994).

Although KRS Chapter 278 grants the Commission sweeping authority to regulate public utilities, the Commission is a creature of statute and its powers are purely statutory, having only such powers as conferred expressly, by necessity, or by fair implication.  *Croke v. Pub. Serv. Comm'n of Kentucky*, 573 S.W.2d 927 (Ky. App. 1978).  "Whether the [Commission] exceeded the scope of its authority is a question of law that we scrutinize closely and review *de novo*."  *Cincinnati Bell Tel. Co. v. Kentucky Pub. Serv. Comm'n*, 223 S.W.3d 829, 836 (Ky. App. 2007) (citing *Commonwealth, Transp. Cab. v. Weinberg*, 150 S.W.3d 75 (Ky. App. 2004)).  Finally, as always, we review questions of law *de novo. City of Greenup v. Pub. Serv. Comm'n*, 182 S.W.3d 535, 539 (Ky. App. 2005) (citing *Revenue Cab. v. Comcast Cablevision of the South*, 147 S.W.3d 743, 747 (Ky. App. 2003)).

*Kentucky Industrial Utility Customers, Inc. v. Kentucky Public Serv. Comm'n*, 504

S.W.3d 695, 704-05 (Ky. App. 2016).

With that in mind, we now turn to the issues at hand.

## II. The Commission did not deprive Pikeville of procedural due process by adjusting Pikeville's wholesale water rate for Southern

As indicated, the first issue presented in this appeal is whether the Commission adjusted Pikeville's wholesale water rate for Southern consistently with Pikeville's right of procedural due process. Pikeville raises several related arguments in this vein which will be addressed in depth below, but their common thread is Pikeville's contention that when it applied for a rate increase, it *only* applied to increase its rate for MWD; it was led to believe over the course of the ensuing rate proceeding that *only* its rate for MWD was going to be at issue; and that when the Commission ultimately adjusted its wholesale rate for Southern as well, it was caught unawares and accordingly denied procedural due process.

We disagree. As outlined below, while Pikeville only sought to increase its wholesale rate for MWD, it had ample notice shortly after the initiation of the underlying rate proceeding and the Commission's associated investigation that *all* of its wholesale rates would be at issue, including its rate to Southern. The facts relevant to Pikeville's contention and associated arguments are as follows. On February 21, 2019, Pikeville filed with the Commission a revised tariff sheet setting forth proposed adjustments to its existing rate for wholesale water service to MWD, to be effective April 5, 2019. In support of its proposed rate adjustment, Pikeville included with its filing a February 5, 2019 cost-of-service study

("COSS") from an entity named RateStudies. The COSS only addressed Pikeville's wholesale relationship with MWD. In sum, since 2009, Pikeville had been charging MWD $1.68 per 1,000 gallons for the first 28,000,000 gallons purchased, and $1.30 per 1,000 gallons beyond that amount. Pikeville sought to raise its existing rate to $2.30 per 1,000 gallons. In the event MWD protested the proposed increase and necessitated a rate case before the Commission, Pikeville proposed an additional monthly surcharge to MWD over 36 months to enable Pikeville to recover its rate case expenses. Notably, Pikeville had no unified rate for all of its wholesale purchasers and instead contracted with each purchaser separately. Included with its tariff filing, Pikeville listed its current rate for wholesale water service to Southern – a rate it did not wish to adjust. Effective October 16, 2018, and pursuant to an uncontested tariff filing of September 13, 2018, Pikeville had been charging Southern a different rate of $2.25 per 1,000 gallons.[3]

On March 4, 2019, MWD submitted a letter to the Commission asking it to open a formal proceeding to investigate Pikeville's proposed rate, establish a procedural schedule, and to ensure that the proposed rate was not placed into effect

---

[3] Before September 13, 2018, Pikeville charged Southern $1.72 per 1,000 gallons. It is unclear from the record when that prior rate was set. But Pikeville acknowledges in its brief that the last time it increased rates for any of its customers – retail or wholesale – prior to 2018 was on January 1, 2012; and the Commission indicated in its January 31, 2020, order on rehearing that since 2002, the only other instance where Pikeville increased its wholesale rates occurred in 2009.

before the Commission conducted a hearing. The Commission issued an order on March 28, 2019, establishing a formal proceeding, suspending the proposed rate until September 4, 2019,[4] making MWD a party to the proceeding and providing any other interested party until April 15, 2019, to intervene. Ultimately, no other party intervened.

In objecting to Pikeville's proposed rate increase, MWD indicated that Pikeville had failed to provide it any evidence from which it could determine that the proposed rate was reasonable. To facilitate the production of that evidence, the Commission entered an order on June 10, 2019, directing Pikeville to answer 29 interrogatories (with multiple subsections) encompassing roughly every aspect of Pikeville's water operations. Of those, interrogatories 12 through 19 and 26 through 29 sought, in sum, detailed information regarding *all* of Pikeville's wholesale customers – including but not limited to their identities; minimum and maximum water usages per month; the amount of water they purchased and for how much in the last 36 months; the rates they were each charged for service; what they paid for the upkeep of the water mains; the amount of water treatment plant capacity reserved for each customer and whether that was expected to change in the next three years; the minutes of each city council meeting in 2018 and 2019 in which a proposed rate adjustment to Pikeville's wholesale customers was

---

[4] *See* KRS 278.190(2).

discussed; all correspondence between Pikeville and its wholesale customers since January 1, 2018, regarding revisions to Pikeville's wholesale rates; how Pikeville had calculated its proposed wholesale rate adjustment; and the annual effect of the proposed rate adjustment on Pikeville's revenues from wholesale water service to each of its wholesale water service customers. Interrogatory 28 also directed Pikeville to "Provide all contracts, if any, for water service between Pikeville, Mountain District, or *Southern Water and Sewer District* that have not been filed with the Commission." (Emphasis added.) Pikeville provided detailed information responsive to each of these interrogatories, much of which involved Southern.

On July 1, 2019, the Commission further directed Pikeville to explain why it had completed a COSS on February 5, 2019 to set a rate for MWD, but not for Southern. On the same date, MWD also submitted interrogatories to Pikeville along the same line of inquiry, including the following:

> If the purpose of the COSS was to ". . . determine a fair water rate for the Mountain Water District . . .," why is the rate proposed for MWD different from the rate proposed for Southern Water District? Explain all differences in allocations of costs and facilities to determine the different rates. Provide the COSS used to set the rate for Southern Water District.

Responding to these interrogatories, Pikeville directed the Commission and MWD to a report it had produced in discovery and referred to as

an "initial COSS," namely, an August 16, 2018 document authored by RateStudies, entitled "Pikeville, Kentucky Water and Wastewater Rate Study And Cost of Service Analysis for Wholesale Customers." Pikeville had presented this report to both MWD and Southern in 2018 during their respective rate increase negotiations. The recommendation of the report was to charge MWD and Southern the *same* rate (*i.e.*, $2.25 per 1,000 gallons) because, as the report elaborated in its analysis on page 24,

> A Cost of Service analysis is a method used to fairly distribute cost to classes of customers based on the services provided to each class. The City of Pikeville does not distinguish between classes of customers such as residential, commercial, or industrial. However, the City provides water service to two other water systems, Mountain Wt. and Southern Wt. *Each of these water systems are charged different rates although they are provided the same level of service*. The purpose of the Cost of Service analysis is to determine a fair water rate for both water systems.

(Emphasis added.)

Pikeville also produced an October 16, 2018 letter it had submitted to MWD during their negotiations. The letter referenced Southern's new effective one-tier wholesale rate of $2.25 per 1,000 gallons, and it offered MWD the *same* rate. As to why Pikeville nevertheless decided to propose a higher rate for MWD (*i.e.*, $2.30 per 1,000 gallons, plus a rate case expense surcharge), Pikeville provided the following response to MWD's interrogatory:

Pikeville initially retained RateStudies to prepare cost-of-service studies for all of Pikeville's water and sewer operations. The initial COSS prepared by RateStudies followed the methodology identified in the American Water Works M54 manual, and it included proposed rates for both Southern Water and Sewer District and Mountain Water District. When Pikeville presented Mountain Water District with the initial COSS, Mountain Water District suggested that the AWWA's M54 methodology was somehow flawed. Rather than fighting over the reasonableness of rates determined by the M54 methodology with MWD, Pikeville requested that RateStudies complete another cost-of-service study specifically for Mountain Water District based on the Debt Service Coverage methodology commonly used by Commission Staff for its staff reports. Southern Water and Sewer District did not object to the initial COSS results. New wholesale water rates to Southern Water and Sewer District were already effective at the time RateStudies completed its second COSS, and therefore, it was unnecessary to include Southern Water and Sewer District in the second COSS.

At the September 10, 2019 final administrative hearing, the questions and testimony focused upon the evidence Pikeville had adduced in response to the Commission's and MWD's extensive interrogatories – evidence that concerned Pikeville's wholesale rates, not simply its wholesale rate for MWD. Notably, the Commission again questioned Pikeville about how Pikeville's cost of service to Southern compared to its cost of service to MWD; and Pikeville's representative, Grondall Potter, reaffirmed the substance of Pikeville's earlier response set forth above. Thus, Pikeville was pressed repeatedly about its wholesale rates for MWD *and* Southern; it did not disagree with the conclusion of its "initial COSS" that it

-11-

was providing MWD and Southern "the same level of service"; nor did it disagree with the conclusion that the two utilities should be charged the same wholesale rate. Boiled down, Pikeville simply believed MWD should pay a higher rate than Southern because, when it proposed a rate increase of $2.25 per 1,000 gallons to both utilities in 2018, Southern settled for that rate and MWD did not. In turn, Pikeville's mixed results in its separate wholesale rate negotiations with Southern and MWD explain why Pikeville's September 13, 2018 tariff filing only sought to increase Southern's rate, and why its February 21, 2019 tariff filing only sought to increase MWD's rate.

The Commission took what is set forth above into consideration when it adjudicated the underlying rate case and held, in its December 19, 2019 order, that "In calculating a fair, just and reasonable wholesale rate . . . Pikeville should charge the same wholesale rate to both of its wholesale customers, Mountain District and Southern District." It ultimately determined Pikeville's evidence supported a wholesale rate of $1.97 per 1,000 gallons, and prospectively[5] adjusted Pikeville's wholesale rates for both MWD and Southern accordingly.

---

[5] The Commission initially ordered Southern's rate to be retroactively adjusted to $1.97 per 1,000 gallons, but subsequently amended its order to make the adjustment prospective.

Pikeville petitioned the Commission to reconsider its holding. In its

January 31, 2020 order on reconsideration, the Commission addressed Pikeville's

arguments and denied its request, explaining in relevant part:

> Pikeville first argues that the issue before the
> Commission was solely Pikeville's wholesale water rate
> to Mountain Water and not the wholesale rate charges to
> Southern District. Pikeville asserts that at no time during
> this proceeding, until the December 19, 2019 Final
> Order, did the Commission notify Pikeville that there
> could be changes to Southern District's wholesale rate.
> Pikeville argues that the Commission's change to
> Southern District's wholesale rate violates KRS 278.200
> (requiring a hearing before a change to water rates
> charged by a city), KRS 278.180 (requiring notice to a
> utility that it will change a rate), and KRS 278.270
> (requiring a hearing and a finding that a rate is
> unreasonable, etc. and proscribing a rate to be followed
> in the future).
>
> Pikeville argues that the Commission failed to adhere to
> any of these requirements because: (1) it did not hold a
> hearing on the wholesale rate to be charged to Southern
> District; (2) it did not provide notice that it would be
> changing the wholesale rate to be charged to Southern
> District; (3) it did not find that the wholesale rate charged
> to Southern District was unjust, unreasonable,
> insufficient, unjustly discriminatory or otherwise in
> violation of KRS Chapter 278; . . . .
>
> The Commission, however, disagrees that it cannot make
> changes to the wholesale rate that Pikeville charges to
> Southern District. The Commission did hold a hearing
> regarding Pikeville's wholesale water rate. During the
> hearing, Pikeville presented evidence regarding the costs
> incurred to provide wholesale water service, thus
> satisfying the hearing requirement in KRS 278.200.
> Pikeville may not have been on specific notice that the

-13-

wholesale rate to Southern District was at issue, but the evidence presented at the hearing and during the proceeding refers almost exclusively of [sic] the cost of providing wholesale water service, and not specifically to Mountain Water. Thus, it is difficult for the Commission to believe that even if Pikeville had been on notice that Southern District's wholesale rate had been at issue, the resulting wholesale rate would have been any different than that for providing the same service to Mountain Water. Furthermore, Pikeville has not provided any indication in its request for a rehearing that it could have presented evidence that Southern District's wholesale rate should be different than Mountain Water's. Pikeville's original proposed wholesale rate to charge Mountain Water was actually $.05 more per 1,000 gallons that [sic] what it had been charging Southern District, indicating that Pikeville believed the cost of providing wholesale service to Southern District might be less than to Mountain Water. Therefore, any additional evidence taken regarding Southern District's wholesale rate, or a subsequent investigation into Southern District's wholesale water rate, could possibly yield a lower rate than that set in the Final Order.

On appeal before this Court, as before the circuit court, Pikeville maintains it was denied procedural due process in this respect. In support, it reasserts the arguments it posed to the Commission in its petition for rehearing. But we agree with the circuit court's conclusion that the Commission's analysis was correct. As stated at the onset, and as discussed above, Pikeville had ample notice shortly after the initiation of the underlying rate proceeding and the Commission's associated investigation that all of its wholesale rates would be at issue; it was provided a hearing where all of the evidence relevant to its wholesale

-14-

rates was adduced and considered; and, despite complaining in its subsequent appeals that it had no opportunity to address the Commission's concerns or the evidence that the Commission considered related to Southern, Pikeville made no contention in its petition for rehearing before the Commission, and makes no contention here, that it could have presented evidence supporting that Southern's wholesale rate should have been different than Mountain Water's. In short, Pikeville was given notice and a meaningful opportunity to be heard, which are the general hallmarks of due process. *See Utility Regulatory Comm'n v. Kentucky Water Service Co., Inc.*, 642 S.W.2d 591, 593 (Ky. App. 1982).

That said, we believe the Commission's analysis requires additional elaboration as it does not address some of the finer points Pikeville raises. First, Pikeville argues that a few details in the administrative record objectively indicated Southern's rates would not be at issue before the Commission, namely, that the Commission did not require Southern to be notified of the proceedings, to intervene in the proceedings, or to be named in the caption of the underlying rate case; nor did the Commission suspend Southern's wholesale rate during the pendency of the underlying rate case. Additionally, Pikeville asserts it had no reason to believe its wholesale rate for Southern would be adjusted because the Commission had already "approved" its wholesale rate for Southern on October 16, 2018, shortly before the underlying rate case was initiated.

-15-

However, while notifying Southern or adding it as a party might have been the better practice, it was unnecessary to make Southern a party to the underlying proceedings to affect its wholesale rate with Pikeville.[6] Also, the Commission could not have suspended Southern's wholesale rate during the pendency of the underlying rate case because, at that time, Southern's wholesale rate had already become effective;[7] it stemmed from a tariff that had already been filed and had gone unchallenged. As such, the Commission could only have adjusted Southern's wholesale rate prospectively, *e.g.*, after it entered its final order.[8] Likewise, Pikeville was presumptively aware that the Commission's prior approval of any wholesale rate does not estop the Commission from subsequently adjusting that rate. *See Fern Lake Co. v. Public Serv. Comm'n*, 357 S.W.2d 701, 704 (Ky. 1962). In any event, the extensive information requests Pikeville

---

[6] To the extent Southern had an interest in the underlying proceedings that was not adequately represented, it *could* have intervened but was not required to do so. *See* 807 Kentucky Administrative Regulation ("KAR") 5:001E § 4(11). Additionally, regardless of its nonparty status, Southern could also have sought review of the Commission's order in this matter. *See* KRS 278.410(1) (Providing in part, "Any party to a commission proceeding *or any utility affected by an order of the commission* may . . . bring an action against the commission in the Franklin Circuit Court to vacate or set aside the order or determination on the ground that it is unlawful or unreasonable." (emphasis added)).

[7] *See* KRS 278.190(1) (providing in relevant part that "the commission may, at any time before the schedule becomes effective, suspend the operation of the schedule and defer the use of the rate . . . .").

[8] The Commission has the statutory authority to modify utility rates, service, or practices once the Commission determines that the rates, service, or practices are not fair, just, and reasonable. However, the changes to rates and service apply on a prospective basis. *See* KRS 278.270.

-16-

received from the Commission clearly placed Pikeville on notice that its wholesale rate for Southern would be examined. As stated at the onset, "[a] general rate case pursuant to KRS 278.190 is a lengthy procedure in which a new base rate is approved only after thorough examination of *all* operations and costs by the [Commission]." *Kentucky Utilities Co.*, 983 S.W.2d at 497 (emphasis added).

Second, Pikeville argues the Commission's adjustment of its wholesale rate for Southern is voidable because the Commission did not comply with KRS 278.180 prior to doing so. In relevant part, that statute provides:

> (1) Except as provided in subsection (2) of this section, no change shall be made by any utility in any rate except upon thirty (30) days' notice to the commission, stating plainly the changes *proposed* to be made and the time when the changed rates will go into effect. However, the commission may, in its discretion, based upon a showing of good cause in any case, shorten the notice period from thirty (30) days to a period of not less than twenty (20) days. *The commission may order a rate change only after giving an identical notice to the utility*. The commission may order the utility to give notice of its *proposed* rate increase to that utility's customers in the manner set forth in its regulations.

*Id.*

Pikeville's argument appears to be that the Commission was required, perhaps at the *onset* of the underlying rate case, to notify Pikeville pursuant to this statute that it intended to change Pikeville's wholesale rate for Southern, and by how much.

-17-

We disagree. The above-quoted statute deals with proposed rate changes, not changes resulting from a rate case investigation. Following the date that it is filed, and absent a request for a hearing by a person with an interest in a proposed rate or by the Commission on its own motion, a proposed rate becomes effective by operation of law upon expiration of the statutory notice required by KRS 278.180. The purpose of the thirty-day notice set forth in the statute is to provide interested parties an opportunity to suspend the proposed rate before it takes effect to investigate its reasonableness. *See* KRS 278.190.

Conversely, when, as here, the Commission chooses to investigate any rate, it maintains the authority to "investigate the methods and practices of utilities to *require them to conform* to the laws of this state, and to all reasonable rules, regulations and orders of the commission not contrary to law." KRS 278.040(3) (emphasis added). Here, Pikeville only sought approval of a proposed rate increase to MWD. However, the Commission could not have assessed the reasonableness or lawfulness of Pikeville's proposed rate without examining all of Pikeville's operations and costs, including Pikeville's cost of servicing Southern. More to the point, the Commission could not have approved or otherwise adjusted Pikeville's proposed rate increase if the result violated KRS 278.030(3)[9] and KRS

---

[9] KRS 278.030(3) provides: "Every utility may employ in the conduct of its business suitable and reasonable classifications of its service, patrons and rates. The classifications may, in any

-18-

278.170(1),[10] which forbid charging unreasonably disparate rates to similarly situated jurisdictional utilities.

In short, while Pikeville may not have been prohibited from attempting to increase one wholesale rate at a time, it was not entitled to presume it could set a single rate for a single wholesale customer in a vacuum. The Commission is obligated by statute to prohibit unreasonably discriminatory rates or disparate treatment among similarly situated classes of customers; and

> Whenever the commission, upon its own motion or upon complaint as provided in KRS 278.260, and after a hearing had upon reasonable notice, finds that any rate is unjust, unreasonable, insufficient, unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission *shall* by order prescribe a just and reasonable rate to be followed in the future.

KRS 278.270 (emphasis added).

Pikeville was provided reasonable notice that all of its wholesale rates were the subject of the Commission's investigation. It was provided ample opportunity to adduce evidence during discovery and during a hearing to justify its wholesale rates. Based upon that evidence, the Commission determined the "fair,

---

proper case, take into account the nature of the use, the quality used, the quantity used, the time when used, the purpose for which used, and any other reasonable consideration."

[10] KRS 278.170(1) provides: "No utility shall, as to rates or service, give any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage, or establish or maintain any unreasonable difference between localities or between classes of service for doing a like and contemporaneous service under the same or substantially the same conditions."

just and reasonable" rate for the level of service Pikeville provided MWD was $1.97 per 1,000 gallons. The evidence Pikeville adduced also indicated Pikeville provided MWD and Southern the *same* level of service. Accordingly, if the Commission adjusted MWD's rate to $1.97 per 1,000 gallons but permitted Southern's rate to remain at $2.25 per 1,000 gallons, the Commission would have violated KRS 278.030(3) and KRS 278.170(1).[11] Under the circumstances of this case it was obligated to commensurately adjust Southern's rate to that level as well, despite Southern's status as a nonparty. This result is consistent with the Commission's precedent[12] and a permissible construction of the operative

---

[11] Pikeville also faults the Commission for not making a specific finding, per KRS 278.270, that its rate of $2.25 per 1,000 gallons for Southern was "unjust, unreasonable, insufficient, unjustly discriminatory, or otherwise in violation of" KRS Chapter 278. However, Pikeville cites no authority indicating the Commission was required to use "magic words" to that effect. The clear implication of the Commission's December 19, 2019 order is that if the Commission had adjusted MWD's wholesale rate, but permitted Southern's rate to remain as it was, the result would have violated KRS 278.030(3) and KRS 278.170(1).

[12] *See, e.g.*, *In the Matter of: Proposed Adjustment of the Wholesale Water Service Rates of the City of Williamstown*, Case No. 2005-00297, 2005 WL 3783587 n.2 (Ky. P.S.C. Nov. 30, 2005) (adjusting the rate of nonparty, non-objecting jurisdictional utility that also purchased wholesale water from municipality "[s]ince no evidence has been submitted to support differing wholesale water service rates"); *In the Matter of: Proposed Adjustment of the Wholesale Water Service Rates of the Frankfort Electric and Water Plant Board*, Case No. 96-595, 1997 WL 34862825 n.1 (Ky. P.S.C. Aug. 11, 1997) (conditioning approval of an agreed wholesale rate upon the rate's application to two similarly situated nonparty, non-objecting jurisdictional utilities, and adding: "The Commission's action today should not be construed as an endorsement of Peaks Mill Water District and Farmdale Water District's conduct. While the Intervenors expended their time and resources to participate in this proceeding, Peaks Mill Water District and Farmdale Water District stood idly by. None of the benefits which will directly accrue to these two public utilities as a result of the Settlement Agreement can be traced to their actions or those of their management.").

statutes.[13]  In short, the Commission did not deny Pikeville due process by *affecting* Pikeville's wholesale rate for Southern, and we affirm to that extent. Whether the wholesale rate that the Commission set was confiscatory, however, will be discussed later in this opinion.

### III.  The Commission did not deprive Pikeville of due process by requiring both Southern and MWD, rather than only MWD, to pay its reasonable rate case costs

The Commission permits recovery of rate case expenses through prospective rate setting.  *See, e.g.*, 807 KAR 5:001E § 16(8)(f).  Indeed, rate case expenses have long been considered appropriate for inclusion in utility rates as a cost of doing business.  *See, e.g.*, *West Ohio Gas Co. v Pub. Utilities Comm'n of Ohio*, 294 U.S. 63, 73, 55 S. Ct. 316, 79 L. Ed. 761 (1935) (explaining such expenses "must be included among the costs of operation in the computation of a fair return"); *Driscol v. Edison Light & Power Co.*, 307 U.S. 104, 120-21, 59 S. Ct. 715, 83 L. Ed. 1134 (1939).  The issue Pikeville raises in this context is not the *amount* of its rate case expenses the Commission deemed it could recover through prospective rate setting surcharges, but *who* the Commission determined it should recover those expenses from.  In the rates it set for both MWD and Southern, the

---

[13] *See Kentucky Occupational Safety & Health Review Comm'n v. Estill Cnty. Fiscal Ct.*, 503 S.W.3d 924, 927-28 (Ky. 2016) ("Where the General Assembly does not use language that addresses the specific question at issue, the standard of review for an agency's interpretation of unclear, ambiguous language in a statute is whether the agency used 'a permissible construction of the statute' to reach its adjudicative decision." (citations omitted)).

Commission split Pikeville's rate case expenses evenly between both utilities. But, in line with its prior argument, Pikeville asserts that because Southern was a nonparty below whose rate should not have been affected at all, MWD should be exclusively responsible for its rate case expenses.

For the reasons stated in our analysis of Pikeville's prior argument, we reject this contention. If Pikeville is also attempting to argue Southern's rights were somehow violated, Pikeville has no standing to do so. Lastly, if Pikeville is attempting to argue that its rate case expenses should not have been prospectively incorporated into the rate of nonparty that did not seek to intervene, we likewise disagree. Rate cases may be initiated by the Commission on its own motion and prosecuted by the Commission regardless of whether any affected utility chooses to intervene. *See* KRS 278.190(1). Even in that circumstance, rate case expenses are still considered a general cost of doing business; and, consistently with that premise and the Commission's precedent,[14] rate case expenses are recoverable even from nonparty affected utilities that choose not to intervene. No error occurred in this regard.

---

[14] *See, e.g.*, *In the Matter of: Electronic Tariff Filing of the City of Harrodsburg Water Dep't Revising its Wholesale Water Service Rates*, Case No. 2022-00349, 2023 WL 3585767, at *7 (Ky. P.S.C. May 16, 2023) (dividing rate case expenses of municipal wholesale water suppliers evenly between its two jurisdictional utility wholesale purchasers who neither objected to the increased rate nor sought to intervene).

**IV. The Commission partially erred in calculating Pikeville's wholesale rate**

A final order of the Commission regarding a rate will only be overturned if it is deemed unreasonable. Our Supreme Court has explained:

> Unreasonable has been construed in a rate-making sense to be the equivalent of confiscatory. This Court has equated an unjust and unreasonable rate to confiscation of utility property. We have declared that rates established by a regulatory agency must enable the utility to operate successfully and maintain its financial integrity in order to meet the just and reasonable non-confiscatory tests.

*Public Service Comm'n of Kentucky v. Dewitt Water Dist.*, 720 S.W.2d 725, 730 (Ky. 1986) (citation omitted). Further,

> The federal and state constitutions protect against the confiscation of property, not against a mere reduction of revenue. A confiscatory rate is one that is unjust and unreasonable. Rates are non-confiscatory, just and reasonable so long as they enable the utility to operate successfully, to maintain its financial integrity, to attract capital and to compensate its investors for the risks assumed even though they might produce only a meager return on the so-called 'fair value' rate base. By long standing usage in the field of rate regulation the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense. Assuming that there is a zone of reasonableness within which the legislature or its designee is free to fix a rate varying in amount and higher than a confiscatory rate it is also free to decrease any rate which is not the 'lowest reasonable rate.'

*Commonwealth ex rel. Stephens v. South Central Bell Tel. Co.*, 545 S.W.2d 927, 930-31 (Ky. 1976) (citations omitted).

As noted, the Commission set Pikeville's rate for the sale of wholesale water at $1.97 per 1,000 gallons. The Commission calculated this rate through the "debt service coverage" method, an accounting method it utilizes to calculate the overall revenue requirement of water districts, water associations, and municipal-owned water utilities. This method is designed to enable utilities to recover an appropriate portion of the following expenses through rate-setting: cash-related pro forma operating expenses; depreciation expense; the average annual principal and interest payments on all long-term debts; and working capital that is in addition to depreciation expense.

Pikeville argues the Commission misapplied the debt service coverage method in setting its wholesale water rate. Specifically, Pikeville contends the Commission miscalculated its revenue requirement by: (1) failing to amortize several of its pre-2017 nonrecurring repair and maintenance expenses; (2) incorrectly reducing its depreciation expense; (3) refusing to recognize, as an allowable operating expense, its cost of electricity attributable to water loss; and (4) refusing to correct, on rehearing, what the Commission acknowledged was its own error in excluding $1,375 of Pikeville's maintenance costs from its calculation of Pikeville's operating expense. We will address these contentions in turn.

**1. Non-amortization of pre-2017 nonrecurring repair and maintenance expenses**

Pursuant to 807 KAR 5:001E § 16(1)(a),[15] all applications for a general rate adjustment shall be supported by either a "fully forecasted test period," or a "twelve (12) month historical test period which may include adjustments for known and measurable changes." Here, Pikeville chose the latter course and was permitted to utilize its fiscal year 2017 as its "historical test period," which is essentially a sample period representative of average annual costs and expenses taken from a multi-year period, used as a baseline for ascertaining its applicable rate. During that "test year" period of fiscal year 2017, Pikeville had "nonrecurring expenses," *e.g.*, expenses that were not representative of its average annual expenses; namely, $99,506 in telemetry repairs and rehabilitation expenses associated with two water tanks, and a $24,264 cost of repairing a high service pump. Pikeville sought to have the entirety of these repair and maintenance costs counted toward its test year operating expenses for ratemaking purposes.

However, when using a historical test period, operations are adjusted to reflect a typical or normal 12-month operating period. Under that approach, amortization is a common way to normalize test year operations for abnormal or nonrecurring items; doing so ensures that the revenue requirement calculated is not

---

[15] 807 KAR 5:001E expired effective June 11, 2023.

artificially elevated based upon costs that will likely not reoccur on an annual basis. The Commission took this approach and amortized the expenses set forth above over a period of 15 years, the estimated useful life of the repairs. The Commission also allocated 33.423% of those expenses to the outside-the-city water system. As a result, and contrary to Pikeville's wishes, the Commission only counted a small fraction of those expenses toward Pikeville's total allowable repair and maintenance costs for the 2017 test year: $4,417 (representing the repairs to the two water tanks) and $1,077 (representing the repairs to the high service pump).

In its petition for rehearing and in each of its subsequent appeals regarding this issue, Pikeville has claimed the Commission should only have amortized these expenses on one condition: The Commission *also* needed to add into its total allowable repair and maintenance costs amortized portions of several of Pikeville's *other* nonrecurring expenses from years *prior* to 2017. This is so, Pikeville explains, because its usual accounting practice is to lump the entire cost of projects like its water tank and service pump repairs into one fiscal year and to declare them as operating expenses, rather than amortize them over several years. Pikeville contends that if it had instead chosen to amortize those types of projects over the years prior to 2017, amortized fractions of those prior project expenses would have carried forward to 2017 and, thus, should have been properly added to

-26-

its allowable repair and maintenance costs for purposes of its 2017 test year and calculating its revenue requirement.

We disagree, and for three separate reasons. First, the Commission is not bound by Pikeville's method of accounting. *See Kentucky Utilities Co.*, 983 S.W.2d at 501. Second, Pikeville did not adduce any evidence of its alleged unamortized project expenses from years prior to 2017 until it filed its post-order petition for rehearing. A petition for rehearing is not an opportunity to adduce evidence that *could* "with reasonable diligence have been offered on the former hearing." *See* KRS 278.400.

Third, we agree with the Commission's assessment that what Pikeville is advocating – prospectively factoring Pikeville's past nonrecurring expenditures into Pikeville's revenue requirement, and thus allowing those expenses to be borne by current and future ratepayers – violates the "filed rate doctrine" and its prohibition against retroactive ratemaking. Where, as here, "the legislature has established a comprehensive ratemaking scheme, the filed rate defines the legal relationship between the regulated utility and its customer with respect to the rate that the customer is obligated to pay and that the utility is authorized to collect." *Cincinnati Bell Tel. Co.*, 223 S.W.3d at 837. Consequently, that "filed rate" cannot be altered *retroactively* and holds constant until a rate change is formally requested or a challenge to the rate is raised by an interested party. *Id.* at 839.

Correspondingly, the filed rate cannot, pursuant to established Commission precedent, be altered *prospectively* to adjust for *past* losses. *See, e.g.*, *In the Matter of: Electronic Tariff Filing of Henderson Water Utility Revising its Wholesale Water Service Rates*, Case No. 2021-00067, 2022 WL 79827, at *3 (Ky. P.S.C. Jan. 4, 2022). Thus,

> While there can be circumstances under which adjustments are permitted for known and measurable post-test-year events or costs, there is neither justification nor precedent for including a pre-test-year expense in the test year for the purpose of determining a utility's revenue requirement.

*In the Matter of: Application of Delta Natural Gas Company, Inc., for an Adjustment of Rates*, Case No. 2010-00116, 2010 WL 4162569 (Ky. P.S.C. Oct. 21, 2010).

Pikeville cites no exception to this general rule. Thus, expenses predating the historical test period were properly excluded from consideration in the underlying rate proceeding. As the circuit court observed in its own review of this matter, if Pikeville wished to recover those prior expenses through rate-setting, it should have timely filed for a base rate increase when it became apparent that its rates were deficient; it should not have waited roughly a decade since its most recent rate increase in 2009 to do so.

**2. Reduction of Pikeville's Depreciation Expense**

As indicated, a factor considered in calculating a revenue requirement for ratemaking purposes under the debt service coverage method is a proper allocation of the utility's depreciation expense. Pikeville argues the Commission inappropriately reduced its depreciation expense allocable to its wholesale customers by a margin of $47,926.60 (rounded up to $47,927). As to how this occurred, some background is necessary. As discussed, on June 10, 2019, the Commission entered an order directing Pikeville to answer 29 interrogatories (some with multiple subsections) encompassing roughly every aspect of Pikeville's water operations. Of those, one interrogatory directly required Pikeville to identify all shared revenues and expenses allocated between Pikeville's inside-the-city and outside-the-city water system divisions; and another required Pikeville to provide depreciation schedules for its water divisions.

The Commission entered its final order adjudicating this matter roughly six months later. There, the Commission noted Pikeville had claimed a total of $414,518 in depreciation expense, but that it had failed to identify depreciation as a shared expense allocated between its two systems, and that Pikeville's depreciation schedules also did not specify that depreciation had been allocated. From this, the Commission gathered that Pikeville had *not* allocated depreciation between its systems. It is uncontested, however, that depreciation

-29-

should have been allocated for purposes of this ratemaking case: Pikeville's wholesale customers only utilized the city's inside-the-city system, but they were not the only ones who did so – Pikeville's separate class of outside-the-city customers utilized Pikeville's outside-the-city system and its inside-the-city water system plant. Thus, based on the quantity of outside-the-city customers also utilizing the inside-the-city water system plant, the Commission allocated 33.423% of the inside-the-city water system plant depreciation expense to the outside-the-city water system. For purposes of this ratemaking case, this had the effect of decreasing Pikeville's total claimed depreciation expense by $136,842. That, taken with another reduction of $5,093 that the Commission made and is not at issue, reduced Pikeville's total depreciation expense to $272,583.

Pikeville petitioned the Commission for rehearing regarding this decrease, faulting the Commission for not knowing – or at least not providing it an additional opportunity to explain – that it *had* treated depreciation as a shared expense between its inside-the-city and outside-the-city systems. Specifically, it contended that it had attributed $47,927 in depreciation expense to its "outside-the-city" customer class and, in so doing, had already excluded that amount from its claimed $414,518 depreciation expense. Pikeville also contended that it had adduced sufficient evidence in support of that proposition. It noted that in one of the Commission's *other* 29 interrogatories, the Commission had instructed it to

produce general ledgers for its proposed test period; and that in response it had produce, among other documents, a 637-page general ledger report of its fiscal year 2017. Page 586 of that report – which appears on page 924 of the 8368-page administrative record – depicts the following relevant entries under a "Description Vendor Name/Remarks" category labeled "special revenue":[16]

| SPECIAL REVENUE | PERIOD CODE | JNL NO. | DATE | CREDIT | BALANCE |
|---|---|---|---|---|---|
| Reclass plant cost to special revenue from wholesale | 1 JE | 21974 | 07/31/2016 | 3,991.42 | (3,991.42) |
| Reclass plant cost to special revenue from wholesale | 2 JE | 21975 | 08/31/2016 | 3,991.42 | (7,982.84) |
| Reclass plant cost to special revenue from wholesale | 3 JE | 21975 | 09/30/2016 | 3,991.42 | (11,974,26) |
| 3-plant cost – adjusting entries October 2016 2-5 | 4 JE | 21978 | 10/31/2016 | 3,991.42 | (15,965.68) |
| 4-plant cost – adjusting entries November 2016 3-9 | 5 JE | 22053 | 11/30/2016 | 3,991.42 | (19,965.68) |
| 5-plant cost – adjusting entries | 6 JE | 22122 | 12/31/2016 | 3,991.42 | (23,948.52) |

---

[16] The chart set forth below is an inexact reproduction of what appears on page 924 of the administrative record. It merely sets forth the relevant substance.

-31-

| | | | | | |
|---|---|---|---|---|---|
| December 2016 4-7 5-plant cost – adjusting entries January 2017 4-5 | 7 JE | 22221 | 01/31/2017 | 3,991.42 | (27,939.94) |
| 4-plant cost – adjusting entries February 2017 | 8 JE | 22315 | 02/28/2017 | 3,991.42 | (31,931.36) |
| 10-plant cost – adjusting entries March 2017 10 | 9 JE | 22425 | 03/31/2017 | 3,991.42 | (35,922.78) |
| 2-plant cost – adjusting entries April 2017 2, 5-7 | 10 JE | 22470 | 04/30/2017 | 3,991.42 | (39,914.20) |
| 9-plant cost - adjusting entries May 2017 9 | 11 JE | 22630 | 05/31/2017 | 4,006.20 | (43,920.40) |
| 6-plant cost – adjusting entries June 2017 4-6 | 12 JE | 22675 | 06/30/2017 | 4,006.20 | (47,926.60) |

Pikeville asserted that, taken as a whole, the above "special revenue" entries indicated it had allocated $47,926.60 in depreciation expense to the "outside-the-city" system, rather than to the "inside-the-city" system. Additionally, Pikeville noted that another of the Commission's interrogatories from June 10, 2019 – specifically, subsection (e) of interrogatory 16 – had required it to "provide a schedule that lists the individual revenue subaccounts in the FYE June 30, 2017 Trial Balance that was combined to arrive at the other income of $252,335 as reported in the COSS." Stated differently, the interrogatory had asked

Pikeville to list what Pikeville had excluded from its "inside-the-city" class

allocation. In response, Pikeville had provided the Commission the following

table:

| 210.10.440.00 | WATER TAP FEE | $24,510.00 |
|---|---|---|
| 210.10.450.00 | WATER PENALTY | $10,911.47 |
| 210.10.451.00 | WATER SPECIAL REVENUE | $150,302.92 |
| 210.10.451.03 | SPECIAL REVENUE | $47,926.60 |
| 210.10.460.00 | WATER S C | $12,457.00 |
| 210.10.475.00 | INTEREST | $1,774.41 |
| 210.10.475.01 | INTEREST | $4,258.09 |
| 210.10.475.01 | INTEREST, ADJ NOT INCLUDED IN COSS | ($62.47) |
| 210.10.490.00 | MISCELLANEOUS | $256.13 |
| | | $252,334.15 |

According to Pikeville, the "special revenue" listed in the above table

was a reference to the "special revenue" listed on page 586 of its fiscal year 2017

general ledger report; and – keeping in mind that Pikeville had now revealed that

"special revenue" actually meant "depreciation allocated to the outside-the-city

system" – the above table therefore demonstrated Pikeville had removed what it

considered was the "outside-the-city" depreciation from its claimed depreciation

expenses of $414,518 for purposes of the underlying rate case. It argued the

Commission had erred by deducting what was essentially *another* "outside-the-

city" share of depreciation from its claimed $414,518 in depreciation expense; and

it asked the Commission to recalculate its depreciation adjustment by factoring in

$47,927, the amount of depreciation expense Pikeville had previously deducted on

its own.

The Commission declined to do so. In its order denying this aspect of Pikeville's petition, the Commission explained that Pikeville had been asked on at least two occasions prior to final adjudication to identify expenses that were allocated to the "inside-the-city" and "outside-the-city" systems, but that it had failed to provide a coherent or clear explanation regarding the allocation of depreciation to enable the Commission to make the determination Pikeville was now advocating. Essentially, the Commission held that Pikeville's post hoc revelation and translation of its accounting jargon was too little, too late, for purposes of the Commission's KRS 278.400 rehearing authority.

On appeal before this Court, as below, Pikeville asserts the Commission erred by refusing to grant it rehearing on this issue. While it would have been desirable for Pikeville to provide a more cogent explanation of its accounting jargon and perhaps broken down the data in a form more readily understand, the information and data were provided to the Commission, and as Pikeville's motion for rehearing pointed out, the Commission incorrectly interpreted the data provided. This mistake by the Commission is the type that should have been corrected as part of rehearing.

## 3. Electrical expense for water loss

The electrical expense of producing water is part of a utility's operating expense – another of the factors relevant to calculating a utility's revenue

-34-

requirement for ratemaking purposes. Pikeville argues the Commission miscalculated its electrical expense associated with water production during the 2017 test year and consequently assigned it an improperly low overall revenue requirement. We agree. Before discussing the specifics of Pikeville's argument, additional background is necessary.

Electrical expense is a variable expense, meaning that it increases proportionally as the gallons of water produced for sale increases. Thus, the Commission's task below was to (1) determine a representative level of electrical expense to include in Pikeville's operating expenses and (2) allocate a fair portion of the electrical expense to the wholesale customers. Internally, Pikeville tracks costs for "inside the city" customers and "outside the city customers," and considers its wholesale customers as part of its "inside the city" customer class. During its test year, Fiscal Year 2017, Pikeville reported a total electrical expense of $343,036; of that, Pikeville attributed $299,596 to producing water for its "inside the city" (and thus wholesale) customers, and $43,440 to producing water for its "outside the city" customers. Notwithstanding, the Commission determined that for ratemaking purposes the proper way of allocating the total electrical expense between Pikeville's "inside the city" and "outside the city" customer groups was to utilize a five-year average of water produced and sold by Pikeville.

Pikeville does not contest the propriety of the Commission's use of a five-year average.

In ascertaining the applicable five-year average, the Commission relied on the following information provided by Pikeville relating to the total gallons of water Pikeville produced and the total gallons of water Pikeville sold to its customers from 2014 to 2018:[17]

| Fiscal yr. | Total Production (gal.) | Inside city (retail) | Outside city | Mountain District | Southern District |
|---|---|---|---|---|---|
| 2018 | 1,087,579,500 | 284,483,307 | 76,950,631 | 412,128,108 | 124,455,000 |
| 2017 | 1,155,123,700 | 281,672,417 | 72,572,900 | 463,158,000 | 155,982,000 |
| 2016 | 1,223,575,100 | 267,187,400 | 76,437,700 | 482,373,000 | 143,611,000 |
| 2015 | 1,320,837,800 | 279,392,200 | 83,794,500 | 509,484,000 | 159,061,000 |
| 2014 | 1,320,131,700 | 269,345,600 | 89,936,400 | 490,097,000 | 183,374,000 |

Ostensibly utilizing this data, the Commission then recalculated Pikeville's allowable electrical expense as follows:

| | |
|---|---|
| Reported Electric Inside City | $ 299,596 |
| Add: Electric Expense Allocated Outside City: | |
| Treatment Plant | 43,440 |
| Total Electric Expense | 343,036 |
| Divided by: Average Water Production | 1,221,449,560 |
| Electric Cost per Gallon | 0.000281 |
| Multiplied by: Average Inside Water Sales | 901,310,007 |
| Reallocated Inside City Electric Expense | 253,268 |
| Less: Reported Electric Expense | (299,596) |
| Pro Forma Adjustment | $ (46,328) |

In sum, the Commission disallowed $46,328 of Pikeville's claimed $299,596 in electrical expenses for its "inside the city" customer group, and thus

---

[17] Pikeville supplied this information in response to a post-hearing data request from the Commission.

reduced Pikeville's claimed operating expenses by that margin, which ultimately reduced Pikeville's overall revenue requirement. On appeal, Pikeville argues the Commission's calculations were incorrect in two ways – the first of which is readily apparent: The five-year "average inside water sales" from 2014 through 2018 is 901,160,806 gallons, not 901,310,007 gallons.

The second way is less obvious, however, and requires closer scrutiny of the production and sales chart set forth previously. Of note, in each fiscal year the sum of gallons of water purchased is less than the total gallons of water produced. For example, in 2014, there was a difference of 287,378,700 gallons. In 2015, 289,106,100 gallons. In 2016, 253,966,000 gallons. In 2017, 181,738,383 gallons. And in 2018, the difference was 189,562,454. These discrepancies represent unaccounted-for water loss – a five-year average of 240,350,327 gallons per year.

Using the Commission's math, producing 240,350,327 gallons of water at an electrical expense of $.000281 per gallon cost Pikeville a five-year average of $67,538 per year. The Commission effectively subtracted this amount – along with the amount attributable to Pikeville's five-year-average electrical expense in producing water for its "outside the city" customer group (roughly $22,463, or 79,938,426 gallons multiplied by $.000281), from Pikeville's claimed electrical expense of $343,036; and in doing so, it arrived at its solution:

Pikeville's expense for *only* producing water for the "inside the city" customer group – and the *only* electrical expense the Commission was willing to recognize for purposes of the underlying rate case – was $253,268 (*i.e.*, what it incorrectly calculated as the "inside the city" customer group's five-year-average purchase of 901,310,007 gallons per year, multiplied by $.000281).

Pikeville, for its part, argues that a full pro rata share of its electrical expenses in producing this lost and unaccounted-for water should have been attributed to its "inside the city" customer group for ratemaking purposes, and that proper consideration of those electrical expenses should have entitled it to roughly $315,000 in total electrical expenses allocable to its "inside the city" (and thus wholesale) customer class, not merely $253,268.

The Commission, on the other hand, stands by its calculations, explaining in its brief:

> Commission regulation 807 KAR 5:066, Section 6(3) limits water loss to 15 percent for ratemaking purposes. As the facts of this case bear out, there was a significant nexus between the amount of water produced and the amount of water sold to customers, well in excess of the 15 percent recoverable by regulation.[18]  Moreover,

---

[18] Tangentially, we note the Commission attempts to bolster its claim of Pikeville's "excessive" unaccounted-for water loss by asserting that Pikeville had a five-year average of "26%" yearly water loss from 2014 through 2018 – an assertion the Franklin Circuit Court found convincing enough to cite as fact in its underlying review.  Once again, however, the Commission's math is wrong.  As set forth herein, Pikeville's average yearly water loss from 2014 through 2018 was 19.68%, not 26%.  To hazard a guess, it appears the Commission arrived at "26%" by improperly adding 240,350,327 (the five-year-average amount of Pikeville's gallons of unaccounted-for water loss) with 79,938,426 gallons (the five-year-average *accounted-for* amount of gallons

Pikeville failed to identify any justification for the discrepancy, and it did not provide any evidence as to why it was entitled to recover those costs from its wholesale customers.

With that said, Pikeville's and the Commission's positions on this subject are both flawed. For rate making purposes, the regulation cited by the Commission, 807 KAR 5:066 § 6(3), does not – contrary to Pikeville's math – permit consideration of all or a *full pro rata share* of electrical expense representing unaccounted-for water loss. Conversely, it does not permit the Commission to exclude *all* unaccounted-for water loss from consideration, either – which is effectively what the Commission did in its calculations set forth above. Indeed, the Commission cites no precedent favoring that aspect of its math, and we have found none.

Rather, 807 KAR 5:066 § 6(3) provides in relevant part that "for rate making purposes a utility's unaccounted-for water loss *shall not exceed* fifteen (15) percent of total water produced and purchased, excluding water used by a utility in its own operations." (Emphasis added.) In other words, for rate making purposes a utility may claim its expenses associated with producing water it unaccountably loses in a given year to the extent that the lost water does not exceed 15% of the total water produced by the utility. Thus, for ratemaking purposes, the formula is

---

Pikeville *sold* to its "outside the city" customers) and dividing that sum by 1,221,449,560 (the five-year-average amount of gallons Pikeville produced).

-39-

as follows: (cost of producing water) multiplied by (percentage of a utility's unaccounted-for water loss exceeding 15% of its total water production) equals (the amount to be deducted from the utility's cost of producing water).[19]

Here, the Commission correctly noted that the five-year average of Pikeville's total water production was 1,221,449,560 gallons per year. 15% of that amount is 183,217,434 gallons. As noted, however, Pikeville's five-year average of unaccounted-for water was 240,350,327 gallons per year – about 19.68%, which exceeded the permitted margin by 4.68%. Accordingly, $343,036 (Pikeville's claimed yearly electrical expense for producing water) multiplied by 4.68% (its water loss % above 15%) equals $16,054 (the amount to be deducted from Pikeville's claimed yearly electrical expense for producing water). For ratemaking purposes, Pikeville's allowable yearly electrical expense for producing water, consistent with 807 KAR 5:066 § 6(3) and the Commission's five-year-average methodology, was therefore $326,982.

---

[19] For a straightforward illustration of how 807 KAR 5:066 § 6(3) is properly applied, *see, e.g.*, *In the Matter of: Electronic Application of Crittenden-Livingston Water District for Authority to Enter into a Loan Agreement with the Kentucky Infrastructure Authority*, Case No. 2020-00232, 2020 WL 5530102, at *1 n.5 (Ky. P.S.C. Sep. 10, 2020):

| | |
|---|---:|
| Purchased Water | 728 |
| Purchased Power | 152,336 |
| Cost of Water | 153,064 |
| Multiply by Water Loss Percentage Above 15% | 6.25% |
| Expense Reduction to Cost of Water | 9,567 |

Having separated Pikeville's costs for excessive water loss from Pikeville's electrical expenses, and having accounted for its permitted water loss, we now turn to what remains: The "inside the city" customer class's pro rata share of the $326,982 electric expense. Over the course of five years, Pikeville sold an average of 981,099,232 gallons of water per year. Of that, it sold an average of 79,938,426 gallons to its "outside the city" customer class per year – roughly 8.15%; and 901,160,806 gallons to its "inside the city" customer class – roughly 91.85%. 91.85% of $326,982 is roughly $300,333.

In sum, the Commission erred in adjusting Pikeville's electrical expense by deducting $299,596 from $253,268. Rather, it should have deducted $299,596 from $300,333. Had it properly done so, it would have arrived at a *positive* pro forma adjustment of $737 to Pikeville's operating expenses, not a *negative* pro forma adjustment of $46,328. Accordingly, the Commission impermissibly reduced Pikeville's pro forma operating expenses by $47,065.

**4. De Minimus expenses**

Due to its own admitted error, the Commission incorrectly excluded an additional allocation of $1,375 of Pikeville's maintenance costs from its calculation of Pikeville's relevant operating expenses. Pikeville brought this error to the Commission's attention in its petition for rehearing, noting that if $1,375 were properly added to its operating expenses for purposes of ascertaining its

revenue requirement, its applicable rate – according to the Commission's math set forth above – would have increased enough to be rounded up by one cent. Specifically, while a revenue requirement of 1,779,005 yielded a rate of $1.97 per 1,000 gallons (rounded down from 1.9739), a revenue requirement of 1,780,380 yielded a rate of $1.98 per 1,000 gallons (rounded up from 1.9755). However, the Commission refused to correct its mistake, explaining that in its view, adding $1,375 to Pikeville's operating expenses was "de minimus because it does not materially impact the calculation of the Plaintiff's wholesale rate." The circuit court later affirmed this aspect of the Commission's order.

On appeal before this Court, Pikeville argues as it did below that the Commission's error in excluding $1,375 from its operating expenses was not harmless because that amount, under the circumstances, should not have been considered "de minimus." This is so because, had that amount been added, its rate would have *changed* according to the Commission's own calculations.

We believe Pikeville's argument has merit. The rule of law associated with the phrase "de minimus" is "*de minimis non curat lex*," which translates from the Latin as "The law does not concern itself with trifles." BLACK'S LAW DICTIONARY 443 (7th ed. 1999). The Commission, in opposing Pikeville on this point, is essentially claiming that a one-cent adjustment to the rate it assessed for Pikeville – as required by its *own* calculations – would be so trivial that the law

should ignore it. And yet, the Commission cites no authority favoring its position, and its own precedent is replete with examples of the Commission specifically approving or disapproving – not ignoring – utility rate adjustments of one cent or less.[20] Stated otherwise, when the Commission interprets and enforces its statutory mandate, it *frequently* concerns itself with one-cent adjustments. We will not presume a one-cent adjustment is a de minimus "trifle."

The Commission also contends in its brief – without citing any precedent – that "if the Court were to rule that a $.01 change to a single class of customer's rates was material, it would collapse the zone of reasonableness, overturning decades of precedent."

However, determining the "zone of reasonableness" in the ratemaking context is a *discretionary* function of the Commission that involves ascertaining

---

[20] *See, e.g.*, *In the Matter of: Purchased Water Adjustment Filing of Dexter-Almo Heights Water district*, Case No. 2017-00228, 2017 WL 2730250 (Ky. P.S.C. Jun. 21, 2017) (approving utility's request, during rate adjustment proceeding, for a rounded-up revised purchased water adjustment factor of $0.28 per 1,000 gallons, rather than $0.27 per 1,000 gallons); *In the Matter of: Purchased Water Adjustment Filing of Reid Village Water District*, Case No. 2017-00277, 2017 WL 3452807 (Ky. P.S.C. Aug. 9, 2017) (approving utility's request, during rate adjustment proceeding, for a rounded-up revised purchased water adjustment factor of $0.09 per 1,000 gallons, rather than $0.08 per 1,000 gallons); *In the Matter of: Purchased Water Adjustment Filing of Henderson County Water District*, Case No. 2018-00102, 2018 WL 1694922 (Ky. P.S.C. April 2, 2018) (approving utility's request, during rate adjustment proceeding, for a rounded-up revised purchased water adjustment factor of $0.51 per 1,000 gallons, rather than $0.50051 per 1,000 gallons); *In the Matter of: Purchased Water Adjustment Filing of Union County Water District*, Case No. 2018-00423, 2019 WL 264979 (Ky. P.S.C. Jan. 15, 2019) (rejecting utility's request, during rate adjustment proceeding, for a purchased water adjustment factor of -$0.36 per 1,000 gallons, and finding instead that a rounded-down factor of -$0.35 per 1,000 gallons was "fair, just, and reasonable").

whether a calculated rate is sufficient to enable the utility to operate successfully and maintain its financial integrity and is therefore just, reasonable, and nonconfiscatory. *Dewitt Water Dist.*, 720 S.W.2d at 730; *see also South Central Bell Tel. Co.*, 545 S.W.2d at 930-31. On the other hand, correcting patent errors in the calculation of a rate is a *ministerial* function of the Commission, not a discretionary one; and it is a function particularly suited for a petition for rehearing. Indeed, this is a point the Commission has recognized in its own precedent. *See, e.g.*, *In the Matter of: An Adjustment of Rider AMRP of the Union Light, Heat and Power Company*, Case No. 2003-00103, 2003 WL 22701501 (Ky. P.S.C. Aug. 29, 2003):

> On August 28, 2003, ULH&P filed a motion for rehearing in which it stated that the Commission's decision was arbitrary, unjust and unreasonable. ULH&P requests that the rates approved for Rate RS Residential Service ("Rate RS") and Rate GS General Service ("Rate GS") be rounded off to the nearest cent and states in support of this request that its billing system is only designed to apply its charges to the nearest cent.
>
> . . .
>
> While the Commission does not find that its Order of August 25, 2003 is "arbitrary, unjust and unreasonable," we do find that a ministerial error in the Order provides a basis to grant ULH&P's motion.

## V. Remand is Necessary for the Commission to Recalculate the Rate

We have identified three errors that the Commission made in calculating the appropriate rate: 1) excluding the $47,927, the amount of depreciation expense Pikeville had previously deducted on its own, from the allowable depreciation adjustment; 2) impermissibly reducing Pikeville's pro forma operating expenses by $47,065; and 3) excluding $1,375 from its operating expenses.

A court passing upon a challenge to the validity of statutory rates does not determine the rates to be adopted as a substitute. *Kentucky Power Co. v. Energy Regulatory Comm'n of Kentucky*, 623 S.W.2d 904, 907 (Ky. 1981); *Central Kentucky Natural Gas Co. v. Railroad Comm'n of Kentucky*, 290 U.S. 264, 271-72, 54 S. Ct. 154, 78 L. Ed. 307 (1933). And courts of review may only vacate or set aside the Commission's rate order after determining that they are "unlawful or unreasonable." *Commonwealth ex rel. Stephens v. South Central Bell Tel. Co*., 545 S.W.2d 927, 931 (Ky. 1976). While we are cognizant of the zone of reasonableness, the errors in this are too substantial and too numerous to simply ignore. According to our math, the errors had a material impact on the rate set by the Commission and were confiscatory.

Accordingly, we reverse and remand merely for the Commission to provide Pikeville a nonconfiscatory wholesale rate consistent with the evidence and 807 KAR 5:066 § 6(3).

## VI. Conclusion

Consistently with what is set forth above, we AFFIRM IN PART, REVERSE IN PART, AND REMAND for further proceedings not inconsistent with this opinion.

ALL CONCUR.

BRIEFS AND ORAL ARGUMENT
FOR APPELLANT:

M. Todd Osterloh
Lexington, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE PUBLIC SERVICE
COMMISSION OF KENTUCKY:

Nancy J. Vinsel
John E.B. Pinney
Jurgens van Zyl
Frankfort, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE MOUNTAIN
WATER DISTRICT:

Monica H. Braun
Gerald Wuetcher
Mary Ellen Wimberly
Lexington, Kentucky

Jim G. Vanover
Pikeville, Kentucky